The **BOEING COMPANY**, Plaintiff,

v.

**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, et al., Defendants.**

Civ. No. 71–96–ORL.

United States District Court,
M. D. Florida,
Orlando Division.

Oct. 16, 1972.

James M. Blue, Granville M. Alley, Jr., Tampa, Fla., for plaintiff.

Plato E. Papps, Bernard Dunau, Washington, D. C., Frank E. Hamilton, Jr., Tampa, Fla., for defendants.

## ORDER

GEORGE C. YOUNG, District Judge.

The Boeing Company (Boeing) brought this suit against the International Association of Machinists and Aerospace Workers, AFL–CIO (IAM), District Lodges 142 and 166 of IAM and Local Lodges 773 and 2061 of IAM seeking a declaratory judgment as to the applicability of a collective bargaining agreement to the plaintiff under Section 301 of the Labor-Management Relations Act, as amended, (the Act).[1] Jurisdiction of this Court under 29 U.S.C. § 185(c) is conceded by all parties and is found to exist by this Court.

The defendants filed their answer and a counterclaim seeking a holding by this Court that Boeing was bound by the agreement in dispute and that Boeing is obligated to submit to arbitration any claims of IAM that Boeing has violated the agreement.

The case was submitted on cross motions for summary judgment with each side agreeing that for the purposes of this case there are no disputed material issues of fact so that the case can and should be determined by application of the law to the admitted facts. Briefs were filed, oral arguments heard and, then at the request of counsel, disposition was stayed to await the decision of the Supreme Court in N. L. R. B. v. Burns International Security Services, Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L. Ed.2d 61, decided May 15, 1972. Thereafter supplemental briefs were filed as to the effect of the *Burns* decision on the case at bar.

The facts are that until April 1, 1971 Trans World Airlines, Inc. (TWA) had a contract with the National Aeronautics and Space Administration (NASA) for support services[2] for NASA at the Kennedy Space Center, Florida. In 1970 Boeing successfully bid for a new contract with NASA to perform the support services which had been rendered by TWA. On April 1, 1971, Boeing commenced full performance under its contract with NASA.

The TWA contract with NASA had run from March 9, 1964 through March 31, 1971. TWA had employed about 1,100 persons to perform the support services other than guard, fire, janitorial and training services which were subcontracted by TWA to other firms. The 1,100 TWA nonsupervisory employees were represented in collective bargaining by IAM which had in force at the time of the expiration of TWA's contract with NASA a collective bargaining agreement with TWA entered into on January 28, 1970 which was to remain in full force and effect to and including December 31, 1971.

TWA, an air carrier, had had a nation-wide collective bargaining agreement already in force and when in 1964

1. 29 U.S.C. § 185(a).

2. Included such services as test support management, plant engineering and main-tenance, logistics operations, mail and postal distribution, janitorial services, fire prevention and protection services, quality assurance, and security services.

TWA secured the NASA support services contract, a supplemental agreement was entered into between TWA and IAM on February 17, 1964 bringing the Kennedy Space Center TWA employees under the nation-wide TWA–IAM agreement. That agreement—subject to the Railway Labor Act—was apparently extended to the non-carrier space center employees of TWA by action of TWA and IAM without any vote of preference by the non-carrier employees. District Lodge 142 and Local Lodge 773 of IAM are the subordinate units of IAM which aided in the administering of the TWA–IAM agreement covering the space center employees.

Prior to its securing the service contract, Boeing had been performing mission launch support services known as "hardware contracts".[3] These services were separate and different from the installation support services performed by TWA prior to April 1, 1971, and after that date by Boeing. There were about 287 employees of Boeing working on the hardware contracts and they were also represented by IAM in collective bargaining pursuant to a nation-wide agreement between Boeing and IAM entered into October 2, 1968 and continuing through October 1, 1971. The subordinate units of IAM which aided in the administering the Boeing-IAM agreement for the space center Boeing hardware contracts employees were District Lodge 166 and Local Lodge 2061.

The wages and fringe benefits provided by the TWA–IAM collective bargaining agreement were higher than those provided by the Boeing-IAM agreement and therein lies the reason for the controversy at bar.

When Boeing first learned that it would get the contract for support services commencing April 1, 1971, it delivered over 1,000 job application forms to TWA's Industrial Relations office for dissemination to TWA employees.

Boeing offered evidence that IAM officials—International and local—had discouraged TWA support service employees from seeking employment with Boeing and for that reason by April, 1971, of the approximately 1,000 Boeing employees hired to perform under the support services contract less than 400 were formerly TWA employees.' At first in the course of this suit the defendants contested that position of the plaintiff and contended there was discrimination by Boeing in its hiring. However, in its brief filed July 3, 1972, IAM withdrew for the purposes of this case that contention. On page 10 of the brief counsel stated:

" . . . we now withdraw, for the purpose of this proceeding only, any claim that Boeing purposely populated its work force with a minority of TWA incumbents in order to avoid the status of successor. We choose in this proceeding to stand or fall on our position that Boeing is a successor independently of any claim that it hired discriminatorily to escape successorship."

In this case the defendants have relied heavily on John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) to establish Boeing as the successor of TWA and thereby bound to the TWA contract with IAM. But the *Burns* case has clarified the *Wiley* decision, p. 286 of 406 U.S., p. 1581 of 92 S.Ct.:

"Its (Wiley) narrower holding dealt with a merger occurring against a background of state law which embodied the general rule that in merger situations the surviving corporation is liable for the obligations of the disappearing corporation."

Boeing and TWA did not merge; they were rivals competing for a contract which resulted in Boeing securing the contract and employing a majority of non-TWA former employees. In *Burns*

3. These included such services as the production of the first stage of the Saturn V launch vehicle, structural work on the launch vehicle tower, high pressure gas system connections and electrical connections to the Saturn V rocket.

(which replaced Wackenhut's protective services at a Lockheed California plant) more than a majority of Wackenhut's employees were employed by Burns. The Court said, p. 279 of 406 U.S., p. 1571 of 92 S.Ct.:

" . . . It has been consistently held that a mere change of employers or of ownership in the employing industry is not such an 'unusual circumstance' as to affect the force of the Board's certification within the normal operative period *if a majority of employees after the change of ownership or management were employed by the preceding employer*." (Emphasis added)

■ *Burns* held that Burns had the duty to bargain with the union with which Wackenhut had had a collective bargaining agreement but that it (Burns) was not bound by the terms of the contract. That holding appears to have been based on finding Burns the successor to Wackenhut as a result of employing a majority of Wackenhut employees. In the case at bar Boeing did not meet that standard of successorship and this Court holds therefore that it was not a successor to TWA.

That holding does not put to rest all remaining issues in the case. In their counterclaim the defendants sought to have Boeing turn over to them dues deductions now being withheld and escrowed by Boeing.

Boeing on March 19, 1971 advised IAM that it would make payroll deductions for union dues and initiation fees under the nation-wide agreement between Boeing and IAM. Thereafter, on April 8, 1971, IAM wrote to Boeing that without prejudice to IAM's position as to Boeing's obligation to perform under the TWA–IAM agreement, IAM members performing installation support services for Boeing would utilize Local Lodge 2061 dues deduction authorization cards for check-offs in accordance with the Boeing-IAM agreement.

On May 3, 1971 Boeing advised IAM that it would deduct but put in escrow —rather than remit—union dues pursuant to an employee's individual authorization. Boeing takes the position that until IAM agrees that the Boeing-IAM agreement is the applicable collective bargaining agreement, it can not under the prohibition of Section 302(c) of the Act make check-offs and pay over the sums collected. Boeing points out the possibility that neither the TWA–IAM nor the Boeing-IAM agreement may be applicable and that it may be ultimately found that the support services employees are unrepresented.[4]

■ However, there is no evidence that anyone has challenged IAM as the collective bargaining agent for the Boeing support services employees—the whole dispute has centered around *which contract* was applicable. Under the circumstances Boeing should remit the withheld dues to Local Lodge 2061 and IAM and Lodge 2061 should provide Boeing with an agreement to indemnify and hold harmless Boeing for any losses it might sustain as a result of such payments to Lodge 2061. It is therefore,

Ordered:

1. Plaintiff's Motion for Summary Judgment be and is hereby granted in that this Court finds that Boeing is not a successor and is not bound by the collective bargaining agreement between TWA and IAM;

2. Defendants' Motion for Summary Judgment on their prayer for an Order requiring arbitration be and is hereby denied;

3. Defendants' Motion for Summary Judgment on their prayer for remittance of dues withheld by Boeing and escrowed is granted and Boeing shall forthwith pay over to Local Lodge 2061 of IAM the dues previously withheld and escrowed for each of those support service employees who were members of IAM and had delivered to Boeing a written assignment as required by Section

---

4. IAM has offered to hold Boeing harmless for any liability it may incur as a result of paying over the deductions made pursuant to the Boeing-IAM agreement.

302(c) of the Act. In addition, Boeing shall pay to Local Lodge 2061, 6% interest on each deduction from the day of deduction to the day of payment to the Lodge. IAM and Local Lodge 2061 shall deliver to Boeing simultaneously with the payments aforesaid, a hold harmless and indemnity agreement, wherein each of said entities—IAM and Local Lodge 2061—agrees to indemnify and hold Boeing harmless from any losses by Boeing because of the payment to Lodge 2061 of the escrowed dues arising from a final finding that IAM was not the collective bargaining agent for the employees from whom such dues were collected.