# HOWARD JOHNSON CO., INC. *v.* DETROIT LOCAL JOINT EXECUTIVE BOARD, HOTEL & RESTAURANT EMPLOYEES & BARTENDERS INTERNATIONAL UNION, AFL–CIO

No. 73–631.   Argued March 19–20, 1974—Decided June 3, 1974

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 265.

*James D. Tracy* argued the cause and filed briefs for petitioner.

*Laurence Gold* argued the cause for respondent. With him on the briefs were *Jerry F. Venn, Donald Sugerman,* and *George Kaufmann.**

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Once again we are faced with the problem of defining the labor law obligations of a "successor" employer to the employees of its predecessors. In this case, petitioner Howard Johnson Co. is the bona fide purchaser of the assets of a restaurant and motor lodge. Respondent Union was the bargaining representative of the employees of the previous operators, and had successfully concluded collective-bargaining agreements with them. In commencing its operation of the restaurant, Howard Johnson hired only a small fraction of the predecessors' employees. The question presented in this case is whether the Union may compel Howard Johnson to arbitrate, under the arbitration provisions of the collective-bargaining agreements signed by its predecessors, the extent of its obligations under those agreements to the predecessors' employees.

Prior to the sale at issue here, the Grissoms—Charles T. Grissom, P. L. Grissom, Ben Bibb, P. L. Grissom & Son,

---

*Gerard C. Smetana, Jerry Kronenberg,* and *Milton Smith* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging reversal.

*Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

Inc., and the Belleville Restaurant Co., a corporation wholly owned by P. L. Grissom & Son—had operated a Howard Johnson's Motor Lodge and an adjacent Howard Johnson's Restaurant in Belleville, Michigan, under franchise agreements with the petitioner. Employees at both the restaurant and motor lodge were represented by the respondent Hotel & Restaurant Employees & Bartenders International Union.[1] The Grissoms had entered into separate collective-bargaining agreements with the Union covering employees at the two establishments. Both agreements contained dispute settlement procedures leading ultimately to arbitration. Both agreements also provided that they would be binding upon the employer's "successors, assigns, purchasers, lessees or transferees."

On June 16, 1972, the Grissoms entered into an agreement with Howard Johnson to sell it all of the personal property used in connection with operation of the restaurant and motor lodge. The Grissoms retained ownership of the real property, leasing both premises to Howard Johnson. Howard Johnson did not agree to assume any of the Grissoms' obligations, except for four specific contracts relating to operation of the restaurant and motor lodge. On June 28, Howard Johnson mailed the Grissoms a letter, which they later acknowledged and confirmed, clarifying that "[i]t was understood and agreed that the Purchaser . . . would not recognize and assume any labor agreements between the Sellers . . . and any

---

[1] Actually, employees at the restaurant were officially represented by the Hotel & Restaurant Employees & Bartenders International Union, while employees at the motor lodge were represented by Local 705 of the Hotel, Motel & Restaurant Employees Union. As the Court of Appeals observed, however, "[w]hile the unions named in the two agreements bear distinct names they are apparently identical in interest and governance." 482 F. 2d 489, 491 n. 3. Both have been represented throughout this litigation by the respondent Detroit Local Joint Executive Board.

labor organizations," and that it was further agreed that "the Purchaser does not assume any obligations or liabilities of the Sellers resulting from any labor agreements . . . ."

Transfer of operation of the restaurant and motor lodge was set for midnight, July 23, 1972. On July 9, the Grissoms notified all of their employees that their employment would terminate as of that time. The Union was also notified of the termination of the Grissoms' business. On July 11, Howard Johnson advised the Union that it would not recognize the Union or assume any obligations under the existing collective-bargaining agreements.

After reaching agreement with the Grissoms, Howard Johnson began hiring its own work force. It placed advertisements in local newspapers, and posted notices in various places, including the restaurant and motor lodge. It began interviewing prospective employees on July 10, hired its first employees on July 18, and began training them at a Howard Johnson facility in Ann Arbor on July 20. Prior to the sale, the Grissoms had 53 employees. Howard Johnson commenced operations with 45 employees, 33 engaged in the restaurant and 12 in the motor lodge. Of these, only nine of the restaurant employees and none of the motor lodge employees had previously been employed by the Grissoms. None of the supervisory personnel employed by the Grissoms were hired by Howard Johnson.

The Union filed this action in the state courts on July 21. Characterizing Howard Johnson's failure to hire all of the employees of the Grissoms as a "lockout" in violation of the collective-bargaining agreements, the Union sought a temporary restraining order enjoining this "lockout" and an order compelling Howard Johnson and the Grissoms to arbitrate the extent of their obliga-

tions to the Grissom employees under the bargaining agreements. The state court granted an *ex parte* temporary restraining order, but the Company refused to honor it, claiming that it had not received adequate notice or service, and the order was dissolved after a hearing on July 24.

The defendants subsequently removed this action to the federal courts on the ground that it was brought under § 301 of the Labor Management Relations Act, 29 U. S. C. § 185. At a hearing before the District Court on August 7, the Grissoms admitted that they were required to arbitrate in accordance with the terms of the collective-bargaining agreements they had signed and that an order compelling arbitration should issue. On August 22, the District Court, in a memorandum opinion unofficially reported at 81 L. R. R. M. 2329 (ED Mich. 1972), held that Howard Johnson was also required to arbitrate the extent of its obligations to the former Grissom employees. The court denied, however, the Union's motion for a preliminary injunction requiring the Company to hire all the former Grissom employees, and granted a stay of its arbitration order pending appeal. Howard Johnson appealed the order compelling arbitration, but the Court of Appeals affirmed. 482 F. 2d 489 (CA6 1973). We granted certiorari, 414 U. S. 1091 (1973), to consider the important labor law question presented. We reverse.

Both courts below relied heavily on this Court's decision in *John Wiley & Sons* v. *Livingston,* 376 U. S. 543 (1964). In *Wiley,* the union representing the employees of a corporation which had disappeared through a merger sought to compel the surviving corporation, which had hired all of the merged corporation's employees and continued to operate the enterprise in a substantially identical form after the merger, to arbitrate

under the merged corporation's collective-bargaining agreement. As *Wiley* was this Court's first experience with the difficult "successorship" question, its holding was properly cautious and narrow:

> "We hold that the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and that, in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement." *Id.*, at 548.

Mr. Justice Harlan, writing for the Court, emphasized "the central role of arbitration in effectuating national labor policy" and preventing industrial strife, and the need to afford some protection to the interests of the employees during a change of corporate ownership. *Id.*, at 549.

The courts below recognized that the reasoning of *Wiley* was to some extent inconsistent with our more recent decision in *NLRB* v. *Burns International Security Services*, 406 U. S. 272 (1972). Burns was the successful bidder on a contract to provide security services at a Lockheed Aircraft plant, and took a majority of its employees from the ranks of the guards employed at the plant by the previous contractor, Wackenhut. In refusing to enforce the Board's order finding that Burns' failure to honor the substantive provisions of the collective-bargaining agreement negotiated with Wackenhut was an unfair labor practice, we emphasized that freedom of collective bargaining—" 'private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract' "—was a " 'fundamental premise' " of the federal labor laws, *id.*, at 287, quoting *H. K. Porter Co.* v. *NLRB*,

397 U. S. 99, 108 (1970), and that it was therefore improper to hold Burns to the substantive terms of a collective-bargaining agreement which it had neither expressly nor impliedly assumed. *Burns* also stressed that holding a new employer bound by the substantive terms of the preexisting collective-bargaining agreement might inhibit the free transfer of capital, and that new employers must be free to make substantial changes in the operation of the enterprise. 406 U. S., at 287–288.

The courts below held that *Wiley* rather than *Burns* was controlling here on the ground that *Burns* involved an NLRB order holding the employer bound by the substantive terms of the collective-bargaining agreement, whereas this case, like *Wiley*, involved a § 301 suit to compel arbitration. Although this distinction was in fact suggested by the Court's opinion in *Burns*, see *id.*, at 285–286, we do not believe that the fundamental policies outlined in *Burns* can be so lightly disregarded. In *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448 (1957), this Court held that § 301 of the Labor Management Relations Act authorized the federal courts to develop a federal common law regarding enforcement of collective-bargaining agreements. But *Lincoln Mills* did not envision any freewheeling inquiry into what the federal courts might find to be the most desirable rule, irrespective of congressional pronouncements. Rather, *Lincoln Mills* makes clear that this federal common law must be "fashion[ed] from the policy of our national labor laws." *Id.*, at 456. MR. JUSTICE DOUGLAS described the process of analysis to be employed:

> "The Labor Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. Some will lack express statu-

tory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy." *Id.*, at 457.

It would be plainly inconsistent with this view to say that the basic policies found controlling in an unfair labor practice context may be disregarded by the courts in a suit under § 301, and thus to permit the rights enjoyed by the new employer in a successorship context to depend upon the forum in which the union presses its claims.[2] Clearly the reasoning of *Burns* must be taken into account here.

We find it unnecessary, however, to decide in the circumstances of this case whether there is any irreconcilable conflict between *Wiley* and *Burns*. We believe that even on its own terms, *Wiley* does not support the decision of the courts below. The Court in *Burns* recognized that its decision "turn[ed] to a great extent on the precise facts involved here." 406 U. S., at 274. The same observation could have been made in *Wiley,* as indeed it could be made in this case. In our development of the federal common law under § 301, we must necessarily proceed cautiously, in the traditional case-by-case approach of the common law. Particularly in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate. The Court was obviously well aware of this in *Wiley,* as its guarded, almost tentative statement of its holding amply demonstrates.

When the focus is placed on the facts of these cases, it

[2] See The Supreme Court, 1971 Term, 86 Harv. L. Rev. 1, 255–256 (1972); Christensen, Successorships, Unit Changes, and the Bargaining Table, in Southwestern Leg. Found., 19th Institute on Labor Law, Labor Law Developments 1973, pp. 197, 205–206.

becomes apparent that the decision below is an unwarranted extension of *Wiley* beyond any factual context it may have contemplated. Although it is true that both *Wiley* and this case involve § 301 suits to compel arbitration, the similarity ends there. *Wiley* involved a merger, as a result of which the initial employing entity completely disappeared. In contrast, this case involves only a sale of some assets, and the initial employers remain in existence as viable corporate entities, with substantial revenues from the lease of the motor lodge and restaurant to Howard Johnson. Although we have recognized that ordinarily there is no basis for distinguishing among mergers, consolidations, or purchases of assets in the analysis of successorship problems, see *Golden State Bottling Co.* v. *NLRB,* 414 U. S. 168, 182–183, n. 5 (1973), we think these distinctions are relevant here for two reasons. First, the merger in *Wiley* was conducted "against a background of state law that embodied the general rule that in merger situations the surviving corporation is liable for the obligations of the disappearing corporation," *Burns,* 406 U. S., at 286, which suggests that holding Wiley bound to arbitrate under its predecessor's collective-bargaining agreement may have been fairly within the reasonable expectations of the parties. Second, the disappearance of the original employing entity in the *Wiley* merger meant that unless the union were afforded some remedy against Wiley, it would have no means to enforce the obligations voluntarily undertaken by the merged corporation, to the extent that those obligations vested prior to the merger or to the extent that its promises were intended to survive a change of ownership. Here, in contrast, because the Grissom corporations continue as viable entities with substantial retained assets, the Union does have a realistic remedy to enforce their contractual obligations. Indeed, the Gris-

soms have agreed to arbitrate the extent of their liability to the Union and their former employees; presumably this arbitration will explore the question whether the Grissoms breached the successorship provisions of their collective-bargaining agreements, and what the remedy for this breach might be.[3]

Even more important, in *Wiley* the surviving corporation hired *all* of the employees of the disappearing corporation. Although, under *Burns*, the surviving corporation may have been entitled to make substantial changes in its operation of the enterprise, the plain fact is that it did not. As the arbitrator in *Wiley* subsequently stated:

> "Although the Wiley merger was effective on October 2, 1961, the former Interscience employees continued to perform the same work on the same products under the same management at the same work place as before the change in the corporate employer." *Interscience Encyclopedia, Inc.*, 55 Lab. Arb. 210, 218 (1970).[4]

---

[3] The Union apparently did not explore another remedy which might have been available to it prior to the sale, *i. e.*, moving to enjoin the sale to Howard Johnson on the ground that this was a breach by the Grissoms of the successorship clauses in the collective-bargaining agreements. See *National Maritime Union* v. *Commerce Tankers Corp.*, 325 F. Supp. 360 (SDNY 1971), vacated, 457 F. 2d 1127 (CA2 1972). The mere existence of the successorship clauses in the bargaining agreements between the Union and the Grissoms, however, cannot bind Howard Johnson either to the substantive terms of the agreements or to the arbitration clauses thereof, absent the continuity required by *Wiley*, when it is perfectly clear the Company refused to assume any obligations under the agreements.

[4] Subsequently, the Interscience plant was closed and the former Interscience employees were integrated into Wiley's work force. The arbitrator, relying in part on the NLRB's decision in *Burns*, held that the provisions of the Interscience collective-bargaining agreement remained in effect for as long as Wiley continued to operate

The claims which the union sought to compel Wiley to arbitrate were thus the claims of Wiley's employees as to the benefits they were entitled to receive in connection with their employment. It was on this basis that the Court in *Wiley* found that there was the "substantial continuity of identity in the business enterprise," 376 U. S., at 551, which it held necessary before the successor employer could be compelled to arbitrate.

Here, however, Howard Johnson decided to select and hire its own independent work force to commence its operation of the restaurant and motor lodge.[5] It there-

---

the former Interscience enterprise as a unit in substantially the same manner as prior to the merger, but that the integration of the former Interscience employees into Wiley's operations destroyed this continuity of identity and terminated the effectiveness of the bargaining agreement. 55 Lab. Arb., at 218–220.

[5] It is important to emphasize that this is not a case where the successor corporation is the "alter ego" of the predecessor, where it is "merely a disguised continuance of the old employer." *Southport Petroleum Co.* v. *NLRB*, 315 U. S. 100, 106 (1942). Such cases involve a mere technical change in the structure or identity of the employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management. In these circumstances, the courts have had little difficulty holding that the successor is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor. See *Southport Petroleum Co.* v. *NLRB, supra; NLRB* v. *Herman Bros. Pet Supply,* 325 F. 2d 68 (CA6 1963); *NLRB* v. *Ozark Hardwood Co.,* 282 F. 2d 1 (CA8 1960); *NLRB* v. *Lewis,* 246 F. 2d 886 (CA9 1957).

There is not the slightest suggestion in this case that the sale of the restaurant and motor lodge by the Grissoms to Howard Johnson was in any sense a paper transaction without meaningful impact on the ownership or operation of the enterprise. Howard Johnson had no ownership interest in the restaurant or motor lodge prior to this transaction. Although the Grissoms' operation of the enterprise as Howard Johnson's franchisee was subject to substantial restraints imposed by the franchise agreements on some aspects of the business, the franchise agreements imposed no restrictions on the

fore hired only nine of the 53 former Grissom employees and none of the Grissom supervisors. The primary purpose of the Union in seeking arbitration here with Howard Johnson is not to protect the rights of Howard Johnson's employees; rather, the Union primarily seeks arbitration on behalf of the former Grissom employees who were *not* hired by Howard Johnson. It is the Union's position that Howard Johnson was bound by the pre-existing collective-bargaining agreement to employ all of these former Grissom employees, except those who could be dismissed in accordance with the "just cause" provision or laid off in accordance with the seniority provision. It is manifest from the Union's efforts to obtain injunctive relief requiring the Company to hire all of these employees that this is the heart of the controversy here. Indeed, at oral argument, the Union conceded that it would be making the same argument here if Howard Johnson had not hired any of the former Grissom employees,[6] and that what was most important

Grissoms' hiring or labor relations policies. There is nothing in the record to indicate that Howard Johnson had had any previous dealings with the Union, or had participated in any way in negotiating or approving the collective-bargaining agreements.

[6] "Question: . . . You say the man is a successor and therefore there never was a break in his contractual obligations. You've still got to make the case for the successorship.

"Mr. Gold [for the Union]: Well, that's right. I think our first duty is to show that there is a continuity of the business enterprise which makes it proper to say that the second employer is a successor.

"Where there isn't a continuity, then he is not a successor and he is not bound by the arbitration clause or any of the other potential obligations which are in the agreement.

"Question: But in deciding successorship, I take it you put aside the fact that he may not have hired *any* of the old employees?

"Mr. Gold: Yes, Your Honor . . . ." Tr. of Oral Arg. 37–38 (emphasis added).

to the Union was the prospect that the arbitrator might order the Company to hire all of these employees.[7]

What the Union seeks here is completely at odds with the basic principles this Court elaborated in *Burns*. We found there that nothing in the federal labor laws "requires that an employer . . . who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is possible that such an obligation might be assumed by the employer." 406 U. S., at 280 n. 5. See also *Golden State Bottling Co. v. NLRB*, 414 U. S., at 184 n. 6. *Burns* emphasized that "[a] potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force, . . . and nature of supervision." 406 U. S., at 287-288. We rejected the Board's position in part because "[i]t would seemingly follow that employees of the predecessor would be deemed employees of the successor, dischargeable only in accordance with provisions of the contract and subject to the grievance and arbitration provisions thereof. Burns would not have been free to replace Wackenhut's

---

[7] "Question: Well, isn't part of your submission . . . that the arbitrator could decide to put all 41 [employees who had been hired by Howard Johnson] back to work?

"Mr. Gold: Yes, Your Honor.

"Question: Which means that the successor does not have the right not to hire, that he must perhaps take over the old employees?

"Mr. Gold: Yes, Your Honor.

.        .        .        .        .

"Question: . . . [Y]ou still say that he may bring his own employees along.

"Mr. Gold: Well, no, one of the rules is that the just cause and seniority provisions of the agreement apply. That is probably the most important aspect of the bargain from the union and the employees' standpoint. And if——

"Question: You certainly are taking quite a bite out of *Burns*, I suppose, in these cases." Tr. of Oral Arg. 27, 33.

guards with its own except as the contract permitted."
*Id.*, at 288. Clearly, *Burns* establishes that Howard
Johnson had the right not to hire any of the former
Grissom employees, if it so desired.[8] The Union's effort
to circumvent this holding by asserting· its claims in a
§ 301 suit to compel arbitration rather than in an unfair
labor practice context cannot be permitted.

We do not believe that *Wiley* requires a successor em-
ployer to arbitrate in the circumstances of this case.[9]

---

[8] See *Crotona Service Corp.*, 200 N. L. R. B. 738 (1972). Of
course, it is an unfair labor practice for an employer to discriminate
in hiring or retention of employees on the basis of union membership
or activity under § 8 (a)(3) of the National Labor Relations Act,
29 U. S. C. § 158 (a)(3). Thus, a new owner could not refuse to
hire the employees of his predecessor solely because they were union
members or to avoid having to recognize the union. See *NLRB* v.
*Burns International Security Services*, 406 U. S. 272, 280–281, n. 5
(1972); *K. B. & J. Young's Super Markets* v. *NLRB*, 377 F. 2d 463
(CA9), cert. denied, 389 U. S. 841 (1967); *Tri State Maintenance
Corp.* v. *NLRB*, 132 U. S. App. D. C. 368, 408 F. 2d 171 (1968).
There is no suggestion in this case that Howard Johnson in any way
discriminated in its hiring against the former Grissom employees
because of their union membership, activity, or representation.

[9] The Court of Appeals stated that "[t]he first question we must
face is whether Howard Johnson is a successor employer," 482 F. 2d,
at 492, and, finding that it was, that the next question was whether
a successor is required to arbitrate under the collective-bargaining
agreement of its predecessor, *id.*, at 494, which the court found was
resolved by *Wiley*. We do not believe that this artificial division
between these questions is a helpful or appropriate way to approach
these problems. The question whether Howard Johnson is a "suc-
cessor" is simply not meaningful in the abstract. Howard Johnson is
of course a successor employer in the sense that it succeeded to opera-
tion of a restaurant and motor lodge formerly operated by the
Grissoms. But the real question in each of these "successorship"
cases is, on the particular facts, what are the legal obligations of the
new employer to the employees of the former owner or their repre-
sentative? The answer to this inquiry requires analysis of the inter-

The Court there held that arbitration could not be compelled unless there was "substantial continuity of identity in the business enterprise" before and after a change of ownership, for otherwise the duty to arbitrate would be "something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved." 376 U. S., at 551. This continuity of identity in the business enterprise necessarily includes, we think, a substantial continuity in the identity of the work force across the change in ownership. The *Wiley* Court seemingly recognized this, as it found the requisite continuity present there in reliance on the "wholesale transfer" of Interscience employees to Wiley. *Ibid.* This view is reflected in the emphasis most of the lower courts have placed on whether the successor employer hires a majority of the predecessor's employees in determining the legal obligations of the suc-

---

ests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc. There is, and can be, no single definition of "successor" which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others. See *Golden State Bottling Co.* v. *NLRB,* 414 U. S. 168, 181 (1973); *International Assn. of Machinists* v. *NLRB,* 134 U. S. App. D. C. 239, 244, 414 F. 2d 1135, 1140 (1969) (Leventhal, J., concurring); Goldberg, The Labor Law Obligations of a Successor Employer, 63 Nw. U. L. Rev. 735 (1969); Comment, Contractual Successorship: The Impact of *Burns,* 40 U. Chi. L. Rev. 617, 619 n. 10 (1973).

Thus, our holding today is that Howard Johnson was not required to arbitrate with the Union representing the former Grissom employees in the circumstances of this case. We necessarily do not decide whether Howard Johnson is or is not a "successor employer" for any other purpose.

264

cessor in § 301 suits under *Wiley*.[10]   This interpretation of *Wiley* is consistent also with the Court's concern with affording protection to those employees who are in fact retained in "[t]he transition from one corporate organization to another" from sudden changes in the terms and conditions of their employment, and with its belief that industrial strife would be avoided if these employees' claims were resolved by arbitration rather than by " 'the relative strength . . . of the contending forces.' "   *Id.*, at 549, quoting *United Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 580 (1960).   At the same time, it recognizes that the employees of the terminating employer have no legal right to continued employment with the new employer, and avoids the difficulties inherent in the Union's position in this case.   This holding is compelled, in our view, if the protection afforded employee interests in a change of ownership by *Wiley* is to be reconciled with the new employer's right to operate the enterprise with his own independent labor force.

Since there was plainly no substantial continuity of identity in the work force hired by Howard Johnson with that of the Grissoms, and no express or implied assumption of the agreement to arbitrate, the courts below erred in compelling the Company to arbitrate the extent of its

_____

[10] See *Printing Specialties Union* v. *Pride Papers Aaronson Bros. Paper Corp.*, 445 F. 2d .361, 363–364 (CA2 1971); *Wackenhut Corp.* v. *Plant Guard Workers*, 332 F. 2d 954, 958 (CA9 1964); *International Assn. of Machinists* v. *NLRB*, 134 U. S. App. D. C., at 244 n. 4, 414 F. 2d, at 1140 n. 4 (Leventhal, J., concurring); *Boeing Co.* v. *International Assn. of Machinists*, 351 F. Supp. 813 (MD Fla. 1972); *Owens-Illinois, Inc.* v. *District 65, Retail, Wholesale, & Department Store Union*, 276 F. Supp. 740 (SDNY 1967); *Local Joint Executive Board, Hotel & Restaurant Employees* v. *Joden, Inc.*, 262 F. Supp. 390 (Mass. 1966).   See also Comment, *supra*, n. 9, at 621.

obligations to the former Grissom employees. Accordingly, the judgment of the Court of Appeals must be

*Reversed.*

MR. JUSTICE DOUGLAS, dissenting.

The petitioner, Howard Johnson, in 1959 and 1960 entered into franchise agreements with P. L. Grissom, P. L. Grissom & Son, Charles T. Grissom, Ben Bibb, and the Belleville Restaurant Company (hereinafter collectively the Grissoms) under which the franchise operated a Howard Johnson Restaurant and Motor Lodge. In 1968 the Grissoms entered into collective-bargaining agreements with the respondent Union affecting both their restaurant and motel employees. On June 16, 1972, the Grissoms sold the business to Howard Johnson, the transfer of management to take place on July 24, 1972. On June 28, Howard Johnson notified the Grissoms that it would not recognize or assume their labor agreements and on July 9, 1972, the Grissoms gave notice to their employees that they would be terminated at midnight, July 23. Howard Johnson began interviewing prospective employees in early July, and when it took over the operation on July 24 it retained only nine of the Grissoms' employees; at least 40 were permanently replaced. The Union brought this action under § 301 of the Labor Management Relations Act, and the District Court issued an order compelling petitioner to arbitrate. The Court of Appeals affirmed, but today this Court reverses, holding that Howard Johnson was not a successor employer. I believe that the principles of successorship laid down in *John Wiley & Sons* v. *Livingston,* 376 U. S. 543, and *NLRB* v. *Burns International Security Services,* 406 U. S. 272, require affirmance, and thus I dissent.

*Wiley* was also a § 301 suit, to compel arbitration. There the company had merged with Interscience,

another and smaller publisher, 40 of whose employees were represented by the union. The union contended that the merger did not affect its right to represent these employees in negotiations with Wiley, and that Wiley was bound to recognize certain rights of these employees which had been guaranteed in the collective-bargaining agreement signed by Interscience. Wiley contended that the merger terminated the collective-bargaining agreement for all purposes and refused to bargain with the union. We held that the union could compel arbitration of this dispute under the arbitration provision of the collective-bargaining agreement even though Wiley had never signed the agreement. We pointed out that the duty to arbitrate will not in every case survive a change of ownership, as when "the lack of any substantial continuity of identity in the business enterprise before and after a change would make a duty to arbitrate something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved." *Wiley, supra,* at 551. But that was not the case in *Wiley:* "[T]he impressive policy considerations favoring arbitration are not wholly overborne by the fact that Wiley did not sign the contract being construed. This case cannot readily be assimilated to the category of those in which there is no contract whatever, or none which is reasonably related to the party sought to be obligated." *Id.,* at 550.

It must follow *a fortiori* that it is also not the case here. The contract between the Grissoms and the Union explicitly provided that successors of the Grissoms would be bound,[1] and certainly there can be no question that

---

[1] "This Agreement shall be binding .upon the successors, assigns, purchasers, lessees or transferees of the Employer whether such succession, assignment or transfer be effected voluntarily or by operation of law or by merger or consolidation with another com-

there was a substantial continuity—indeed identity—of the business operation under Howard Johnson, the successor employer. Under its franchise agreement Howard Johnson had substantial control over the Grissoms' operation of the business; [2] it was no stranger to the enterprise it took over. The business continued without interruption at the same location, offering the same products and services to the same public, under the same name and in the same manner, with almost the same number of employees. The only change was Howard Johnson's replacement of the Union members with new personnel, but as the court below pointed out, petitioner's reliance upon that fact is sheer "bootstrap": "[Howard Johnson] argues that it need not arbitrate the refusal to hire Grissoms' employees because it is not a successor. It is not a successor, because it did not hire a majority of Grissoms' employees." 482 F. 2d 489, 493.

As we said in *Wiley,* "[i]t would derogate from 'the federal policy of settling labor disputes by arbitration,'. . . if a change in the corporate structure or ownership of a business enterprise had the automatic consequence of removing a duty to arbitrate previously established . . . ." 376 U. S., at 549.

*NLRB* v. *Burns International Security Services; supra,* does not require any different result. There the

---

pany provided the establishment remains in the same line of business." 482 F. 2d 489, 491.

[2] The motel franchise agreement provided, for example, that Howard Johnson would determine and approve standards of construction, operation, and service, and would have the right at any time to enter the premises for that purpose; that prior approval would be required for equipment and supplies bearing the name "Howard Johnson"; that Howard Johnson would have the first option to purchase if the business were to be sold, and that in any event Howard Johnson must approve any successor. See the District Court opinion, 81 L. R. R. M. 2329, 2330, and App. 50a *et seq.*

original employer, Wackenhut, had a contract with Lockheed to provide security services, and at the expiration of that contract Lockheed took bids on providing the service and hired Burns to replace Wackenhut. Wackenhut employees had been represented by the union, but Burns, which hired 27 of the 42 Wackenhut guards, refused to bargain with the union or honor the collective-bargaining agreement signed by Wackenhut. We affirmed the NLRB's order requiring Burns to bargain with the union, but concluded that Burns was not bound by the substantive provisions of the collective-bargaining agreement between the union and Wackenhut. In distinguishing *Wiley,* we pointed out in *Burns* that unlike *Wiley* it did not involve a § 301 suit to compel arbitration, and thus was without the support of the national policy favoring arbitration. *Burns, supra,* at 286. Moreover, in *Burns* "there was no merger or sale of assets, and there were no dealings whatsoever between Wackenhut and Burns. On the contrary, they were competitors for the same work, each bidding for the service contract at Lockheed. Burns purchased nothing from Wackenhut and became liable for none of its financial obligations." *Ibid.*

All of the factors distinguishing *Burns* and *Wiley* call here for affirmance of the order to arbitrate. This is a § 301 suit, and Howard Johnson did purchase the assets from the Grissoms. As a matter of federal labor law, when Howard Johnson took over the operation that had been conducted by its franchisee, it seems clear that it also took over the duty to arbitrate under the collective-bargaining agreements which expressly bound the Grissoms' successors. Any other result makes nonsense of the principles laid down in *Wiley.* The majority, by making the number of prior employees retained by the successor the sole determinative factor, accepts petition-

er's bootstrap argument. The effect is to allow any new employer to determine for himself whether he will be bound, by the simple expedient of arranging for the termination of all of the prior employer's personnel. I cannot accept such a rule, especially when, as here, all of the other factors point so compellingly to the conclusion that petitioner is a successor employer who should be bound by the arbitration agreement.