[Civ. No. 44284. Second Dist., Div. Five. Apr. 30, 1975.]

LOCAL JOINT EXECUTIVE BOARD OF HOTEL AND
RESTAURANT EMPLOYEES AND BARTENDERS
INTERNATIONAL UNION OF LONG BEACH
AND ORANGE COUNTY, Plaintiff and Respondent, v.
3539 CENTURY, INC., et al., Defendants and Appellants.

## COUNSEL

Shapiro, Robin, Cohen & Posell and Edward B. Robin for Defendants and Appellants.

Gottlieb, Gottlieb & Stein, Adrienne Stein, Emanuel Gyler and Karl Manheim for Plaintiff and Respondent.

## OPINION

**STEPHENS, J.**—Plaintiff Local Joint Executive Board of Hotel and Restaurant Employees and Bartenders International Union of Long Beach and Orange County brought an action in the superior court to bind defendants 3539 Century, Inc., dba Stops Coffee Shop and Pete Vescio to a collective bargaining agreement originally entered between the plaintiff and Lynwood Catering Corporation, dba Stops Coffee Shop (Lynwood). The plaintiff also sought to be recognized by the defendants as the exclusive bargaining agent for the employees of the Stops Coffee Shop. Plaintiff contended in the trial court that it was entitled to prevail because defendants were the successors to the business of Lynwood. The trial court upheld this position despite plaintiff's failure to demonstrate that a substantial number of Lynwood's employees had been employed by defendants. The trial court concluded that the number of employees

carried over was without significance. Defendants maintain that the case of *Howard Johnson Co.* v. *Hotel Employees,* 417 U.S. 249 [41 L.Ed.2d 46, 94 S.Ct. 2236] requires us to reverse the judgment. We agree.

*Facts*

On May 22, 1972, plaintiff and Lynwood executed a collective bargaining agreement to become effective on June 1, 1972. Less than two months after the effective date of the agreement, Lynwood entered into an escrow with Pete Vescio for the sale and purchase of the business enterprise known as Stops Coffee Shop by 3539 Century, Inc. Pete Vescio, as nominee for 3539 Century, Inc., took possession of the establishment on September 1, 1972. The establishment was closed for four days and reopened under the same name on September 5, 1972.

In the interim, defendants posted a sign which informed the public that the establishment was closed for remodeling and was under new management. Defendants interviewed prospective employees, employing some who had worked at the premises for Lynwood, but employing others who had not previously worked for Lynwood. The evidence contained nothing which would indicate the number or percentage of Lynwood employees who were carried over to the "new" business. The evidence does indicate that the defendants repudiated the collective bargaining agreement, refused to recognize the union, and established their own terms and conditions for all of their employees.

The new management made relatively few other changes. The restaurant reopened at the same location, with the same name, the same sign, the same facility (although refurbished), and a similar menu. *There is no contention, however, that the sale did not in fact create a true change in ownership.*

On this state of facts, the trial court concluded that there was substantial continuity of, and a continuing identity of the subject enterprise, held that the defendants were bound by the collective bargaining agreement, and ordered the defendants to recognize the plaintiff as the exclusive bargaining agent for defendants' employees.

*Discussion*

No one contends that the defendants in this case are bound by ordinary principles of contract law to respect the collective bargaining agreement here involved. Rather, the plaintiff's claim is animated by the principles enunciated in *John Wiley & Sons* v. *Livingston,* 376 U.S. 543 [11 L.Ed.2d 898, 84 S.Ct. 909]. There, the court held that "the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by agreement, and that, in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement." (*Id.,* at p. 548 [11 L.Ed.2d at p. 904].) The court recognized that a collective bargaining agreement was not an ordinary contract, but rather was an instrument whose scope and contours were to be construed in the context of national labor policy. The court was careful to note, however, that *Wiley* could not be cited for the proposition that "in every case in which the ownership or corporate structure of an enterprise is changed the duty to arbitrate survives. . . . [T]here may be cases in which the lack of any substantial continuity of identity in the business enterprise before and after a change would make a duty to arbitrate something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved." (*Id.,* at p. 551 [11 L.Ed.2d at p. 905].) Thus the *Wiley* court indicated that the finding of a duty to arbitrate the extent to which a prior collective bargaining agreement should bind the new employer depended on a showing of a "substantial continuity of identity in the business enterprise." In *Wiley,* the finding of "substantial continuity of identity" was "evidenced by the wholesale transfer of Interscience employees to the Wiley plant, apparently without difficulty." (*Id.*)

Despite the emphasis placed in *Wiley* on the carry-over of former employees, a number of courts have held that a finding of substantial continuity of identity in the business enterprise does not depend upon a showing that a certain percentage of former union employees have been retained. (See, e.g., *Holayter* v. *Smith,* 29 Cal.App.3d 326 [104 Cal.Rptr. 745].)

The position taken by these courts was recently reviewed and rejected in *Howard Johnson Co.* v. *Hotel Employees, supra,* at pages 263-264 [41 L.Ed.2d at p. 57]: "This continuity of identity in business enterprise

necessarily includes, we think, a substantial continuity in the identity of the work force across the change in ownership. . . . This view is reflected in the emphasis most of the lower courts have placed on whether the successor employer hires a majority of the predecessor's employees in determining the legal obligations of the successor in § 301 suits under *Wiley*. [Fn. omitted.]"

Plaintiff seeks to distinguish *Howard Johnson* on the basis that in that case the union's primary purpose was to compel the new employer to arbitrate with respect to the employees of the predecessor who were not hired by Howard Johnson. Here the plaintiff union seeks to require the defendants "to provide their employees with the benefits embodied in the collective bargaining agreement."[1]

The distinction is an attractive one. In *Howard Johnson,* the court was principally concerned with the right of a new employer to select and hire its own independent labor force. There are certainly persuasive considerations rooted in the policy of national labor laws which commend a different outcome when employee benefits are at issue. As the court observed in *Wiley*: "Employees, and the union which represents them, ordinarily do not take part in negotiations leading to a change in corporate ownership. The negotiations will ordinarily not concern the well-being of the employees, whose advantage or disadvantage, potentially great, will inevitably be incidental to the main considerations. The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship." (*Id.,* at p. 549 [11 L.Ed.2d at p. 904].)

However persuasive these policy considerations might be, we are convinced that the principles of *Howard Johnson* were not intended to be confined to discharge clauses. First, the holding of the court in *Howard Johnson* is not confined to a discharge clause. Instead, the court held that the union could not compel arbitration on behalf of the predecessor's employees independent of whether or not they were retained. Second, the court approvingly cited cases involving benefits which placed emphasis "on whether the successor employer hires a majority of the

---

[1]The plaintiff places particular stress on the section of the contract involving health and welfare benefits. In fact, the judgment requires defendants to enforce all 34 sections of the agreement, including a section regulating discharges, a section similar to that in *Howard Johnson*.

predecessor's employees in determining the legal obligations of the successor in § 301 suits under *Wiley*. [Fn. omitted]."*(Id.*, at pp. 263-264 [41 L.Ed.2d at p. 57], citing *Printing S.&P.P.U. No. 447* v.. *Pride P. Aaronson Bros. P. Corp.* (2 Cir. 1971) 445 F.2d 361, 363-364; *Boeing Co.* v. *International Ass'n of Machinists & A. Wkrs.* (M.D.Fla. 1972) 351 F.Supp. 813.) Third, the court reaffirmed the policy recognized in *NLRB* v. *Burns Security Services*, 406 U.S. 272 [32 L.Ed.2d 61, 92 S.Ct. 1571] that "freedom of collective bargaining—' "private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract" '—was a ' "fundamental premise" ' of the federal labor laws . . . ." (417 U.S. at p. 254 [41 L.Ed.2d at p. 52], quoting *Burns, supra*, at p. 287 [32 L.Ed.2d at p. 61].) It similarly reaffirmed *Burns'* concern that "holding a new employer bound by the substantive terms of the pre-existing collective-bargaining agreement might inhibit the free transfer of capital, and that new employers must be free to make substantial changes in the operation of the enterprise." (*Id.*, at p. 255 [41 L.Ed.2d at p. 52], citing 406 U.S. at pp. 287-288 [32 L.Ed.2d at p. 61].)

It is true that the court in *Howard Johnson* indicated that the employer in that case might be a successor for other purposes, but "[a]lthough the Court carefully noted that whether an employer is a successor depends on the specific legal obligation at issue, it distinguished only among broad classes of obligation—the duty to bargain, the duty to arbitrate, the duty to remedy unfair labor practices—rather than among particular issues to be arbitrated . . . Likewise, the Court's discussion of the requirement of substantial continuity does not mention that the issue to be arbitrated was the right to continued employment, but states the requirement more broadly as one 'seemingly recognized' in *Wiley*." (Note, 88 Harv.L.Rev. 265, 268, fn. 23.) Thus, *Howard Johnson* stands for the proposition that "for the duty to arbitrate to arise at all there must be continuity in the work force, regardless of the issue to be arbitrated."[2] (Note, 88 Harv.L.Rev. 265, 268.)

■ It, of course, follows a fortiori that if an employer could not be required to arbitrate the extent to which terms of a predecessor's

---

[2]In short, we do not believe that the *Howard Johnson* rationale would permit or require us to balance national labor law policies with respect to each of the 34 sections of the agreement involved in the present case.

Plaintiff's citation to *Retail Clerks Union, Local 775* v. *Purity Stores, Inc.*, 41 Cal.App.3d 225 [116 Cal.Rptr. 40] misses the mark. In *Purity*, the successor had recognized the applicability of the collective bargaining agreement.

agreement should be binding, an employer can likewise not be compelled to respect the terms of such an agreement without even being permitted to arbitrate the question.

Plaintiff suggests that even if the principles of *Howard Johnson* counsel a result different from its position, we should refuse to follow the dictates of the Supreme Court. Plaintiff insists that decision making in this area is not governed exclusively by federal statutes or case law, but instead federal principles must yield to considerations best effectuating California public policy. This contention was crisply answered in *Textile Workers* v. *Lincoln Mills*, 353 U.S. 448, 457 [1 L.Ed.2d 972, 981, 77 S.Ct. 912]: "Federal interpretation of the federal law will govern, not state law. . . . But state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy."[3] *Howard Johnson's* construction of the purpose of section 301 compels us to conclude, albeit reluctantly, that the trial court erred in ordering recognition of the union[4] and erred in ordering the employer here to respect the provisions of the predecessor's collective bargaining agreement.

The judgment is reversed.

Kaus, P. J., and Ashby, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 26, 1975.

---

[3] We do not understand the plaintiff to argue that the restaurant involved here is not in interstate commerce. Given the expansive interpretations of the commerce clause, it would be a rare restaurant that could justifiably claim to be only in intrastate commerce. (See, e.g., *Katzenbach* v. *McClung*, 379 U.S. 294 [13 L.Ed.2d 290, 85 S.Ct. 377]; *Local Joint Exec. Bd., Hotel & R. Emp. & Bar. Int. U.* v. *Joden, Inc.* (Mass. 1966) 262 F.Supp. 390.) Indeed, the plaintiff in this case has invoked the processes of the NLRB to procure a settlement agreement on a matter relating to this case.

Even if this restaurant were in intrastate commerce exclusively, we would not be inclined to reach a different result. It would be exceedingly strange to have the fate of a restaurant's collective bargaining agreement depend upon the amount of food ordered in interstate commerce.

[4] Indeed, the purchaser would not have been bound to recognize the union even if the predecessor had been subject to an outstanding and unsatisfied order of the NLRB. As the court explained in *Golden Gate Bottling Co.* v. *NLRB*, 414 U.S. 168, 184 (n. 6) [38 L.Ed.2d 388, 402, 94 S.Ct. 414]: "[T]he purchaser, if it does not hire any or a majority of those employees, will not be bound by an outstanding order to bargain issued by the Board against the predecessor nor by any order tied to the continuance of the bargaining agent in the unit involved." There is no suggestion in this case that the defendants discriminated against the Lynwood employees because of their union status or that the defendants are the *alter ego* of Lynwood.