**UNITED STEELWORKERS OF AMERICA, Plaintiff,**

v.

**SOUTH BEND LATHE, INC., Defendant.**

**No. H 76–115.**

United States District Court,
N.D. Indiana,
Hammond Division.

May 6, 1986.

William H. Schmelling, Chicago, Ill., Bernard Kleiman, Pittsburgh, Pa., for plaintiff.

Franklin A. Morse, II, Lynn C. Tyler, South Bend, Ind., for defendant.

## MEMORANDUM DECISION

KANNE, District Judge.

This action was brought by a labor organization against an employer under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and the United States Arbitration Act, 9 U.S.C. §§ 4 and 5. The plaintiff is the United Steelworkers of America (International Union) and the defendant is South Bend Lathe, Inc., (SBL), an Indiana corporation. The International Union seeks an order of this court directing SBL to submit to final and binding arbitration certain collective bargaining disputes involving pension funding provisions. SBL asserts that it has no duty to arbitrate the pension funding provisions in question. Consistent with this court's pretrial order the parties have submitted this case for judgment based on detailed stipulations of fact, designated exhibits, and designated deposition transcripts.

## FACTUAL BACKGROUND

Prior to July 1, 1975, SBL was owned and operated by Amsted Industries, Inc. (Amsted), a Delaware corporation, having its principal place of business in Chicago, Illinois. Amsted's principal activity at its South Bend Lathe division was manufacturing and selling metal cutting lathes and other machine tool products. Prior to the acquisition of Amsted by SBL, J.R. Boulis had been employed by Amsted, as president of its South Bend Lathe Division.

In a mass meeting of Amsted personnel, President Boulis confirmed news reports that a determination had been made by Amsted in late 1974 to sell or dispose of its South Bend Lathe Division. Boulis and other officers sought to develop a means by which the South Bend Lathe Division could be purchased from Amsted by Amsted's own employees, through the mechanism of an Employee Stock Ownership Plan (ESOP). The Economic Development Administration of the U.S. Department of Commerce issued a Five Million Dollars ($5,000,000.00) grant to South Bend, which was in turn loaned to LWE, Inc.[1] With another Two Million Six Hundred Thousand Dollars ($2,600,000.00), borrowed from commercial lenders, SBL purchased certain assets of Amsted's South Bend Lathe Division. The only other prospective purchasers were C.J. Wood, Inc., and Acme Industries; both were reputed liquidators.

Following SBL's acquisition, effective July 1, 1975, all but thirty of Amsted's 440 employees were retained. SBL continued manufacturing metal cutting lathes, using the same machinery, equipment, and materials which had been used by Amsted. Any changes made by SBL in the production methods were routine changes, consistent with such an ongoing business.

The acquisition agreement between SBL and Amsted provided, in part, for the purchase of "includable assets". Specifically *excluded* from the definition of "includable assets" were "all labor agreements". The

1. At the time of the acquisition of Amsted the defendant was an Indiana corporation named LWE, Inc. After the acquisition LWE, Inc., changed its name to SBL, the defendant herein.

collective bargaining agreement most recently negotiated prior to the acquisition, between Amsted and its employees, was effective (by its terms) from October 7, 1974, through October 6, 1977. The agreement contains a successorship clause.

In particular, the 1974 agreement set forth certain pension and insurance benefits for retirees, pursuant to an earlier retirement plan and an earlier pension agreement, which were extended to remain in effect, by the 1974 agreement, until October 6, 1977. The defendant SBL was not in existence when the 1974 agreement was negotiated and denies that it is bound by its terms.

United Steelworkers of America, Local 1722 (Local Union) is a subordinate of the International Union, the plaintiff, and consists only of SBL employees. Together with the International Union, the Local Union represents SBL employees for the purposes of collective bargaining. The International Union did not participate in the acquisition of Amsted by SBL. However, officers of the Local Union and other employees of Amsted were aware that SBL's proposal specifically excluded Amsted's pension liability. A staff representative of the International Union was also made aware of the exclusion of pension liability in April, 1975. Shortly before the acquisition agreement nearly all of the 440 Amsted employees unanimously supported SBL's acquisition, having been assured by Boulis that the terms and conditions of their employment would be continued by SBL, with the exception of pension benefits and certain insurance benefits.

On June 27, 1975, before the acquisition, Boulis wrote both the International Union and Local Union, informing that SBL (then LWE, Inc.) did not intend to assume any obligations under the 1974 agreement. Boulis further informed them that labor obligations would remain the responsibility of Amsted. Boulis also proposed a new collective bargaining agreement that was virtually identical to the 1974 agreement, with the exception that the ESOP would replace the pension benefits; other minor exceptions are not relevant to this action. The proposed agreement had been discussed with the president and vice-president of the Local Union; both agreed to the modifications.

Following the acquisition, the International Union began negotiations with Amsted and SBL concerning the effect of the acquisition on the pension benefits of SBL's employees. Both Amsted and SBL rejected both the International Union's proposal for three-party negotiations and the International Union's proposal that Amsted and SBL share liability for pension benefits, coordinating any benefits generated by SBL's ESOP. It was understood, however, that Amsted would pay pension benefits to employees who retired prior to July 3, 1975, and to employees with thirty years of service or who were at least fifty-five with fifteen years service. Neither the Pension Benefit Guaranty Corporation nor the Internal Revenue Service, both of whom were notified, objected to Amsted's commitments to continue paying these benefits.

Negotiations relating to remaining disputes about either Amsted's of SBL's liability for pension benefits under the 1974 agreement were unsuccessful. On January 8, 1976, a grievance was submitted to SBL by Local Union representatives, at the direction of the International Union. President Boulis refused to accept the grievance and the International Union's attempt to appeal the grievance, on the ground that SBL was not a party to the 1974 agreement.

The International Union commenced this action against Amsted and SBL on April 30, 1976, seeking an order compelling tripartite arbitration. On October 1, 1976, this court granted Amsted's motion for summary judgment. Four SBL employees filed another suit against Amsted and the International Union on March 27, 1980. The district court's grant of summary judgment was affirmed on appeal in *Baker v. Amsted Industries*, 656 F.2d 1245 (7th Cir. 1981). In June, 1983 Amsted and the International Union submitted stipulated issues

to an arbitrator, who found the International Union's claim barred by timeliness grounds, without reaching any substantive issues.

In December, 1977 SBL and the International Union (who still represented SBL employees) negotiated a collective bargaining agreement, effective May 3, 1978. With the exception of retirement benefits, the agreement provided for all terms and conditions of employment. Successive collective bargaining agreements have been entered into governing the time period from May 7, 1978, through August 31, 1984. A number of disputes, unrelated to pension benefits, have been resolved by final and binding arbitration.

A second suit against Amsted was filed on December 7, 1983, by the same plaintiffs in the first *Baker* suit (Baker II). In the second suit, *Baker v. Amsted Industries,* Civil No. H 83–0754 (Baker II), plaintiffs allege that Amsted and SBL breached the 1974 agreement; the International Union violated its duty of fair representation; and that ERISA entitles them to equitable relief respecting their rights to pension and insurance benefits.

### ISSUE

While there are many questions involved in this case they all center around one issue of overriding importance: Does SBL, Amsted's acquiring corporation, have a duty to arbitrate the pension liability dispute with the International Union?

### JUDICIAL DECISION ON ARBITRABILITY

At the outset, the International Union argues that the issue of whether SBL has a duty to arbitrate should not be decided by the court, but by the arbitrator. The International Union cites to the 1974 agreement which states in its introduction:

THIS AGREEMENT, dated as of the 7th day of October, 1974, is between SOUTH BEND LATHE, South Bend, Indiana, *or its successor,* hereinafter referred to as the "Company" and UNITED STEELWORKERS OF AMERICA, for itself and on behalf of the members of LOCAL UNION NO. 722, hereinafter referred to as the "Union." (Emphasis added.)

The 1974 agreement contains the following grievance procedure:

Should differences arise between the Company and the Union or its members employed by the Company as to the meaning and application of the provisions of the Agreement, should any local trouble of any kind arise in the plant, there shall be no suspension of work on account of such differences, and there shall be an earnest effort made to promptly adjust and settle differences in the following manner:

The final step of the grievance and arbitration procedure is submission of the dispute to final and binding arbitration.

The International Union's argument (that the arbitrator and not the court must decide whether there is a duty to arbitrate) is two-fold. First, the International Union argues, pursuant to *Steelworkers v. American Mfg. Company,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), that claims which are governed by a contract, agreed to by the parties, must be decided by the arbitrator. Second, the International Union argues that deciding the arbitrability issue would entangle this court in the merits of the dispute. *Communications Workers of America v. Western Electric,* 751 F.2d 203 (7th Cir.1984).

The International Union's first argument assumes that SBL is a party to the 1974 agreement. In *American Mfg.,* the court stated that, "The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator." *American Mfg.,* 363 U.S. at 567, 568, 80 S.Ct. at 1346. The 1974 agreement is between Amsted's South Bend Lathe Division and the United Steelworkers of America. The defendant SBL was not in existence and can only be a "party" if this court finds that SBL is a successor, within the meaning of the successorship doctrine. The International Union's first argument therefore, assumes the

very issue in this case; that is, whether SBL is a party to the 1974 agreement.

■ The plaintiff's second argument is that deciding the arbitrability issue would entangle the court in the merits of the dispute. Generally, the arbitrability issue is for the court:

> Under our decisions, whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties.

*John Wiley & Sons v. Livingston*, 376 U.S. 543, 546–47, 84 S.Ct. 909, 912–13, 11 L.Ed.2d 898 (1964). However, the entanglement exception to this rule has been recognized in a number of different situations.

■ In *Communications Workers of America v. Western Electric*, 751 F.2d 203 (7th Cir.1984), the court declined to decide the arbitrability issue based on the entanglement exception.[2] *Communications Workers* was a suit to compell arbitration, brought by a union pursuant to § 301 of the LMRA of 1947, 29 U.S.C. § 185(a) (1982) (hereafter § 301). In that case there was no successorship issue; the arbitrability issue involved the construction of a number of clauses within the collective bargaining agreement, requiring interpretation of substantive provisions. *Id.* at 206, 207. The court specifically noted and distinguished *Wiley:*

> The question in *Wiley* was whether the arbitration rights under a collective bargaining agreement survived a corporate merger. Deciding that issue did not involve consideration of the merits of the grievances which concerned employee 'vested' rights such as seniority status, severance pay, etc.

*Id.* Like *Wiley* and unlike *Communications Workers,* the case before this court involves the successorship doctrine and not the substantive merits of the dispute as to SBL's potential pension liability. This

case, therefore, does not come within the entanglement exception and this court must decide the arbitrability issue.

## SBL's DUTY UNDER THE SUCCESSORSHIP DOCTRINE

The International Union argues that SBL has a duty to arbitrate the predecessor corporation's (Amsted's) collective bargaining agreement because it is a successor corporation within the meaning of the "successorship doctrine". The successorship doctrine was developed in *John Wiley & Sons v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

Like this case *Wiley* was a § 301 suit to compel arbitration. In *Wiley,* a predecessor merged with a smaller publishing company, forty of whose employees were represented by the union. *Wiley,* 376 U.S. at 545, 84 S.Ct. at 912. The union contended that the merger did not affect its right to represent these employees in negotiations with Wiley. Wiley contended that the merger terminated the collective bargaining agreement. The court held that the union could compel arbitration even though the collective bargaining agreement had never been signed by Wiley. *Id.* at 548, 84 S.Ct. at 913.

Subsequent successorship cases have noted the narrow holding of *Wiley* and the need for a case by case approach in § 301 cases:

> In our development of the federal common law under § 301, we must necessarily proceed cautiously, in the traditional case by case approach of the common law. Particularly in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate. The Court was obviously well

---

**2.** *See also, Local 703, International Brotherhood of Teamsters v. Kennicott Bros.,* 725 F.2d 1088 (7th Cir.1982) (declined to decide arbitrability

where claim based on substantive interpretation of contract clause.)

aware of this in *Wiley,* as its guarded, almost tentative statement of its holding amply demonstrates.

*Howard Johnson Co. v. Hotel Employees,* 417 U.S. 249, 256, 94 S.Ct. 2236, 2240, 41 L.Ed.2d 46 (1973) (referring to *NLRB v. Burns Int'l Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972)). In deciding successorship cases the Supreme Court has carefully fashioned federal law with national labor policy in mind.

In *Wiley,* the Court recognized that, "Employees, and the Union which represents them, ordinarily do not take part in negotiations leading to a change in corporate ownership." *Wiley,* 376 U.S. at 549, 84 S.Ct. at 914. The Supreme Court went on to note that the advantage or disadvantage to employees is normally incidental to other considerations. *Id.* The Court reasoned that:

> The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by *some protection to the employees from a sudden change in the employment relationship.* (Emphasis added).

*Id.* The court went on to say that industrial strife would be avoided if the parties were made to arbitrate. *Id.*

In the case at bar there were three potential purchasers of Amsted. The parties have stipulated to the fact that two of them were liquidators. The other, the defendant SBL, was a corporation formed so that the employees of Amsted could purchase their own company through the mechanism of an ESOP. John Peak and Jerry Vogal, the president and vice-president of the (employees') local union, respectively, were involved in the development of the ESOP on a continuing basis. The parties have also stipulated to the fact that both the management and the personnel of Amsted's South Bend Lathe Division believed that if either of the two liquidating companies successfully purchased the Division, operations would cease and the employees would be terminated. Moreover, the parties stipulated that on June 30, 1975, virtually all of Amsted's South Bend Lathe Division employees expressed their confidence in the (ESOP) acquisition in a mass meeting.

When the facts of this case are carefully considered it is apparent that the employees took part in the negotiations leading up to the change in corporate ownership. While the International Union argues in its brief that employee involvement in or approval of the acquisition is not relevant as the International Union is the sole contracting party, this court finds that employee involvement is relevant to the labor policy favoring employee protection. In this case the employees acted on their own behalf and in doing so protected their own employment. Moreover, the important policy of preventing industrial strife does not come into play in this case. The employees actively decided to acquire a business. They did so by their own choice, fully aware that the ESOP would replace their pension benefits.

Throughout its brief, the International Union argues that where there is "substantial continuity of the employing enterprise" the duty to arbitrate passes to the successor corporation. In *Wiley,* the court held that arbitration could not be compelled unless there was "substantial continuity of identity of business enterprise" before and after the change of ownership, otherwise the duty to arbitrate would be "something imposed from without, not reasonable to be found in the particular bargaining agreement and the acts of the parties involved." *Howard Johnson,* 417 U.S. at 263, 94 S.Ct. at 2243, *quoting Wiley,* 376 U.S. at 551, 84 S.Ct. at 915. SBL argues that a duty to arbitrate is not within its reasonable expectations.

Both *Wiley* and *Howard Johnson* considered continuity of the work force a part of continuity of business enterprise. *Id.* To that extent, as the International Union's brief points out, there was continuity of the business enterprise. By stipulation the

parties agree that SBL produced products with the same employees, equipment, and materials which Amsted had used, for the same type of customers. SBL also retained all but thirty of Amsted's 440 employees. If continuity of business enterprise was limited to the above factors, it certainly existed.

However, the Court in *Howard Johnson* made it clear that:

> [T]he real question in each of these 'successorship' cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative? *The answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case* and the particular legal obligation which is at issue, whether it be ... the duty to arbitrate, etc. *There is, and can be, no single definition of 'successor'* which is applicable to every legal context. (Emphasis added.)

*Howard Johnson,* 417 U.S. at 262, 263 fn. 9, 94 S.Ct. at 2243 fn. 9. In short, this court cannot ignore the facts of this case as they relate to the interests of the parties and the important labor law policies involved.

■ To hold that SBL is a successor because the operational aspects of its business remained the same, without regard to the capital structure of the business, would be too narrow a way of determining continuity of business enterprise. Pursuant to the requirements set forth in *Howard Johnson,* this court finds that the capital structure of SBL is a factor to be considered in determining whether continuity of business enterprise exists.

The concept of an ESOP was introduced into the tax code in 1974, when Congress enacted the Employee Retirement Income Security Act, providing benefits to firms establishing such plans. One purpose of an ESOP is to create incentive for a corporation to structure its financing to give employees an ownership interest in his or her company.[3] One court has recognized Congress' repeated encouragement of ESOP's, evidenced by legislation granting favorable tax treatment. *Donovan v. Cunningham,* 716 F.2d 1455, 1456 (5th Cir. 1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984).

■ The International Union asks this court to judicially notice a General Office Accounting report which identifies a number of problems with ESOPs. Similarly, the defendant asks the court to take judicial notice of a number of articles which consider the beneficial economic effects of ESOPs. This court, however, does not need to make a determination of whether ESOPs are beneficial or detrimental. It is sufficient for the court to note that ESOPs have congressional support and that they change the very nature of an employee's relationship to his employer, as well as the employer's capital structure. To this extent SBL's ESOP significantly changed the capital structure and affected the interests of both parties. This court cannot find, therefore, that there was continuity of the business enterprise sufficient to impose the successorship doctrine on SBL, simply because the operational aspects of the business remained the same.

Beyond the labor policy which seeks to protect employees from a change in business structure the successorship cases have recognized a policy favoring the free transfer of capital. *NLRB v. Burns Security Services,* 406 U.S. 272, 303, 92 S.Ct. 1571, 1590, 32 L.Ed.2d 61 (1971).[4] In *Burns,* the court held that the National Labor Relations Board could not require the successor to observe the substantive terms of the predecessor's collective bargaining agreement, although it could re-

---

**3.** See remarks of Senator Long, 129 Cong.Rec. S16629–S16630 (daily ed. Nov. 17, 1983).

**4.** While *Burns* was not a § 301 suit to compel arbitration, *Howard Johnson* considered its poli-cy considerations important within the context of the successorship doctrine. *Howard Johnson,* 417 U.S. at 256, 94 S.Ct. at 2240.

quire the successor to bargain with the union. *Id.* at 278, 285, 92 S.Ct. at 1577–1581.

The court recognized the important policy favoring free transfer of capital:

A potential employer may be willing to take over a moribund business *only if he can make changes* in corporate structure, composition of labor force, work location, task assignment, and nature of supervision. Saddling such an employer with the terms and conditions of employment contained in the old collective bargaining contract may make these changes impossible and *may discourage and inhibit the free transfer of capital.* (Emphasis added.)

*Burns,* 406 U.S. at 287, 288, 92 S.Ct. at 1582. This policy is particularly relevant in the case before the court as SBL, with its ESOP, was the only prospective purchaser which could save Amsted's business from ultimate liquidation.

Noting the tension between compulsory arbitration under the successorship doctrine and the free transfer of capital, the court recognized that without limitations, the successorship doctrine runs counter to free collective bargaining. *Id.* at 302, 92 S.Ct. at 1589. To impose a duty on SBL to arbitrate would unduly inhibit the free transfer of capital which in this case has kept SBL a viable company and provided its employees with jobs since SBL's acquisition of Amsted in 1975.

■ As the employee's interests were adequately protected, as the policy of avoiding industrial strife is not present, as there is no substantial continuity of the business enterprise, and as the policy favoring free transfer of capital strongly favors this result, the court finds that SBL has no duty to arbitrate Amsted's 1974 collective bargaining agreement under the successorship doctrine.

## ASSUMPTION OF ARBITRATION COMMITMENTS

Plaintiff, further argues, however, that even if there is no duty under the "succes-

sorship doctrine", SBL assumed the arbitration commitments of the 1974 agreement by its conduct.

■ In particular, International Union argues that SBL's conduct prior to the acquisition amounted to an implied assumption of a commitment to arbitrate. This argument is based on the similarity of the arbitration procedures set up by SBL. The argument, however, overlooks a number of important stipulated facts. Both the International and local unions were informed on June 27, 1975, that SBL did not intend to assume any obligations under the 1974 agreement. Also, while the collective bargaining agreement proposed by Boulis was identical to the 1974 agreement in procedure, it was clear that the ESOP replaced the previous pension benefits. These stipulated facts preclude plaintiff's argument that SBL impliedly agreed to arbitrate the pension dispute.

The defendant justly argues that the International Union has abandoned, or is estopped from asserting any rights under the 1974 agreement. The court need not consider this argument however, since it now finds that SBL has no duty to arbitrate the 1974 agreement.

Based upon the foregoing findings, it is clear that SBL has no duty to arbitrate in light of the interactions, relations and representations regarding the acquisition of SBL from Amsted.

IT IS THEREFORE ADJUDGED that South Bend Lathe, Inc., has no duty to submit to arbitration its pension funding dispute with the United Steelworkers of America, the relief requested by the United Steelworkers of America is hereby DENIED; and, JUDGMENT is ORDERED entered in favor of South Bend Lathe, Inc., and against the United Steelworkers of America.