### In re KAISER STEEL CORPORATION, Debtors.

**Bankruptcy No. 87 B 1552 E.**

United States Bankruptcy Court, D. Colorado.

Feb. 15, 1989.

Craig Christensen, Hal Lewis, Sherman and Howard, Denver, Colo., for debtors.

Barbara J. Hillman, Cornfield and Feldman, Chicago, Ill., for United Mine Workers of America.

## ORDER ON APPLICATION TO SELL PROPERTY

**CHARLES E. MATHESON, Chief Judge.**

The Debtor, Kaiser Coal Corporation ("Kaiser"), filed an application with this Court to sell a part of its Utah coal properties, commonly known as the South Lease, Columbia and Horse Canyon Mines, Carbon County Railway and Wellington Preparation Plant, free and clear of all liens, claims and encumbrances to Intermountain Power Agency ("IPA"). In addition, the Debtor applied to the Court for approval of the sale of the Somerset Mine free and clear of liens, claims and encumbrances to Bear Coal Company, Inc. ("Bear"). In each instance, objections have been filed to the proposed sale by the United Mine Workers of America ("UMWA"). The essence of UMWA's objection is premised on the argument that the underlying collective bargaining agreement requires the purchasers, IPA and Bear, to assume successorship liabilities to the UMWA employees.

Kaiser and UMWA are parties to a collective bargaining agreement. That agreement provides it is to apply to the operation of all coal lands and coal preparation facilities owned or leased by Kaiser or acquired by Kaiser during the term of the agreement which may, during the term of the agreement, "be put into production or use." Bargaining Agreement, Article IA, section (f). The contract further provides, in Article I thereof,

> This Agreement shall be binding upon both signatories hereto, and their successors and assigns. In consideration of the Union's execution of this Agreement, the Employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this Agreement.

The UMWA argues that the collective bargaining agreement applies to the mine sites to be sold to IPA and Bear. It argues further that the purchasers are "successors" for purposes of Article I of the bargaining agreement and are bound to assume all of the obligations under that agreement as they pertain to the operations of these mine sites. Because the contracts for sale between Kaiser and IPA and Bear, respectively, do not require the assumption of successorship liabilities, UMWA objects to the sale.

The underlying facts in this matter are not in dispute. At the time Kaiser purchased the properties in question, they were not operating. Further, Kaiser has never operated the properties, although Kaiser has engaged in some non-extractive work at the Somerset Mine. The UMWA does not assert that the closure of the mines was engaged in for any nefarious purpose to avoid the obligations under the bargaining agreements.

 There is the threshold question as to whether the collective bargaining agreement is in effect as to operations at these properties. First of all, the Court notes, as stated above, that pursuant to Article IA(f), the contract was only to be applied to properties acquired by Kaiser during the term of the agreement which had been "put into production or use." Such is not the case with the instant properties. Further, the evidence indicates that Kaiser had given notice of termination of the bargaining contract as permitted by its terms. In 1987, the parties entered into an Extension Agreement. That Extension Agreement provided, in pertinent part:

> 1) The party of the first part continues to recognize the Union as the collective bargaining representative of its employees at its mines and facilities located in Raton, New Mexico (District 15) and Sunnyside, Utah (District 22) covered by the

National Bituminous Coal Wage Agreement of 1984 (hereinafter "1984 Agreement");

2) Notwithstanding the prior timely termination notice given by the Debtor under Article XXIX of the 1984 Agreement, the parties agree to extend their 1984 Agreement until the earlier of the events below:

(a) 11:59 p.m. of January 31, 1989; or

(b) 11:59 p.m. of the fourteenth (14) day following the execution of a successor national agreement between the UMWA and BCOA, as ratified by the UMWA membership.

Nothing was said in that 1987 extension agreement concerning the properties now proposed to be sold. The agreement did specify, however, that it was:

the intent of the parties to neither enhance nor detract from the rights existing prior to this agreement but only to extend the 1984 Agreement, and maintain the status quo while the parties continue to negotiate.

In 1988 a second Extension Agreement was entered into. That agreement contained the same general terms as the 1987 agreement, except that paragraph 2 thereof stated:

2) The parties having previously entered into the 1987 Extension Agreement and the same being about to expire, the parties agree to continue to extend their 1984 Agreement as provided below:

(a) As to the Raton, New Mexico Mines, until 11:59 p.m. MST of the thirtieth day following closing of the sale of the New Mexico Mines to P & M or any other buyer approved by the Bankruptcy Court; and

(b) As to the Sunnyside, Utah Mine, until 11:59 p.m. MST of the thirtieth day following closing of the sale of the Sunnyside, Utah Mines to any buyer approved by the Bankruptcy Court.

Kaiser argues that, pursuant to the 1988 Extension Agreement, the collective bargaining agreement was continued only as to the Raton, New Mexico and Sunnyside, Utah Mines. That argument is premised on the language of paragraph 2 of the 1988 Extension Agreement which made references only to those two properties.

The UMWA vehemently protests. It characterizes Kaiser's argument as being "totally fallacious." The Court is not as sanguine.

The difference in the language between the 1987 and 1988 Extension Agreements is marked. In 1987, the parties agreed to "extend their 1984 Agreement until" a specified date. In 1988, the parties agreed to "extend their 1984 Agreement as provided below...." Pursuant to the 1988 Extension Agreement, it was to deal only with the extension as to Raton and Sunnyside to a date to be determined by the sale of those respective properties.

It appears inconceivable to the Court that the parties would have so carefully continued the collective bargaining agreement with respect to Raton and Sunnyside to a date to be fixed by specific events, and left the contract open-ended as to any other property owned by Kaiser. It is more reasonable to construe the contract as it was written in 1988 and extend the collective bargaining agreement only as to Raton and Sunnyside. Such a construction further is consistent with the provisions of Article IA(f) of the collective bargaining agreement as quoted above to the effect that it should only apply to properties "put into production or use," which the instant properties have not. Thus, the Court concurs in Kaiser's argument and finds that the contract (a) did not apply to the properties being sold inasmuch as the properties had not been put into production or use, and (b) even if it did apply to such properties, the contract has lapsed and was not extended as to these properties by the 1988 Extension Agreement.

■ Even if the Court were to assume that the collective bargaining agreement is still in effect, the objections of the UMWA are still not well taken. The Court has examined the authorities presented by the UMWA and believes that they do not support its position. To the contrary, the proper rule in these matters has been estab-

lished by the district court in the case of *United Mine Workers of America, International Union v. U.S. Steel Mining Company, Inc.,* 636 F.Supp. 151 (D.Utah 1986). In that case the district court held:

> Based on a careful reading of the 1984 NBCWA and the entire file, this court is convinced that, as a matter of law, a mining "operation," for purposes of Article I of the 1984 NBCWA, refers to a mine site or facility where active coal mining operations are being conducted. That is, an "operation" connotes a mine that is actively producing coal and operating as a coal mine. Thus, a mine that has ceased to function as an active coal mine is not an "operation," assuming the mine was closed in good faith. *Ibid,* 636 F.Supp. at 153–54.

The provision in the collective bargaining contract requiring any successor to agree to assume Kaiser's obligations under the contract was created by the UMWA in response to the 1974 Supreme Court decision in *Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). In that case the Supreme Court held that a purchaser of assets was not bound by its predecessor's labor agreement despite language in the agreement purporting to bind the employer's successors.

The arguments of the UMWA had been considered and were expressly rejected by the district court in the *UMWA v. U.S. Steel* case referred to above, *supra.* The UMWA disputes the efficacy of the district court opinion and has cited to the Court decisions of the Arbitration Review Board ("Board"). The decisions cited by the UMWA, in the Court's view, not only do not further the UMWA's case but, in fact, lend support for the propriety of the district court's decision in the *UMWA v. U.S. Steel* case.

The initial decision of the Board to which the Court has been referred is that of *Standard Pocahontas Coal Corp., (Petitioner), and Local Union 7086, District No. 29, United Mine Workers of America (Respondent),* Decision 78–16, decided September 22, 1979. In that case, White Ridge, the former operator of the "Chickasaw Job Site," closed operations, laid off its employees and sold its equipment. Subsequently, the former operator contracted with a new operator (Standard Pocahontas) to mine and deliver coal from the site to the former operator. The Board found that the issue in the case had to be resolved in light of "the operative facts of the relationship between the former operator and the contractor." Under the circumstances of that case, the Board found that there was a "linkage" between the two and states, in referring to the contract between the two parties:

> This contract, by whatever label one puts on it, is an operating contract which, by its terms and purposes, procures Standard Pocahontas to mine White Ridge's coal from White Ridge's leasehold under White Ridge's mining permits and requires Standard Pocahontas to deliver all coal produced to White Ridge's tipple. Moreover, Standard Pocahontas is to perform those operating services subject to the approval of White Ridge's Managing Engineer and subject to White Ridge's ultimate control over the methods and mechanisms utilized, and its compensation for the services is in the form of a "contracting fee" rather than by sale of coal or other form of compensation. The arrangement clearly is for the benefit of White Ridge in the form of continuing the mining operation which it abandoned as its own operation but now has operated for it by Standard Pocahontas.

Under these circumstances, the Board had no hesitancy in finding that Standard Pocahontas was a "successor" because of the evident operational "linkage", holding:

> Where a former operator of a mine site (or other covered facilities under the National Agreement) makes direct contractual arrangements with another operator for operation of the site or facilities in a manner in which the second operation takes over and continues a part or all of the operation for the benefit of the former operator, then, by virtue of the "successors and assigns" and "leasing, subleasing and licensing out" provisions of the National Agreement, the second op-

erator becomes a successor employer when the second operator becomes bound by the National Agreement without modification.

The second decision argued by the UMWA is that of *Local Union 2935, District No. 27, United Mine Workers of America, Petitioner, and Nephi Coal Properties, Inc., Gut Fork Mine, Respondent,* Case No 78–90, decided October 10, 1979. In that case, the owner of mining rights in the Gut Fork Mine leased it to Jasper Mining Co. ("Jasper") for the purpose of having Jasper mine and deliver coal to a preparation plant operated by the owner. Jasper subsequently terminated its operations, withdrew its equipment, and laid off its employees. Subsequently, the owner leased the mine to Nephi Coal Properties, Inc. ("Nephi") which also operated, mined and delivered coal to the owner for processing. The Union argued that Nephi was a successor to Jasper and bound by the underlying collective bargaining agreement.

The Board considered the Union's argument and concluded that Nephi was not a successor. The Board cited the prior decisions establishing that before a subsequent operator could be determined to be a successor, there must be a finding of some "linkage", and the Board found that such "linkage" did not exist even though both Jasper and Nephi held their operating lease from the same owner and mined the coal for delivery to that owner. In that opinion, the Board concluded:

> Accordingly, the conclusion reached here is that where there is no sale, conveyance, or other transfer or assignment of an operation between a former operation [*sic* operator] of a mine site or facility and a subsequent operator of a mine site or facility, and not other financial or organizational linkage between them, there is no basis for finding, under the National Agreement, that the subsequent operator is the "successor or assignee" of the former operator for purposes of requiring the subsequent operator to hire and employ the employees of the former operator on the basis of their

rights gained under National Agreement coverage with the former employer.

The language in the collective bargaining agreement before the Court specifies that the agreement is to be binding on "successors and assigns." A company such as Kaiser had operations at various mine sites and the employees at each site were covered. If Kaiser elected to sell one site, the purchaser might well have asserted that, under the law, it was not a "successor" to Kaiser since Kaiser would continue to exist and operate other properties. To assure continuity under the contract, UMWA bargained for the provision which specifies that if Kaiser sold any of its "operations," it would require the purchaser to assume Kaiser's obligations under the agreement as they pertained to that operation.

The choice of the word "operations" is meaningful. It connotes something more than the sale of a piece of machinery. It contemplates the transfer of an active producing property. To be sure, and as recognized in the *U.S. Steel* case, *supra,* the Court should be vigilant to guard against a shutdown and subsequent sale which is in reality a subterfuge calculated to evade the Union's rights and interests. It was the existence of such "linkage" of continuous operating interests that concerned the Board in its decision *78–16* discussed above, but no such "linkage" exists in the present case. The Court, therefore, concludes that the purchasers here are not "successors" to Kaiser within the meaning of the collective bargaining agreement and that the sale of the properties to them without requiring them to specifically assume Kaiser's obligations under that agreement is proper.

Having considered the arguments of the UMWA, and having considered the evidence presented in support of the applications to sell the properties, the Court concludes that the sale of the properties to IPA and Bear on the terms and conditions specified would be in the best interest of this Debtor's estate and would not be violative of the underlying agreement with the UMWA and, therefore, ought to be ap-

**674**

proved. Pursuant to the Court's findings and conclusions set forth above,

IT IS THEREFORE ORDERED that the sale of the assets by Kaiser Coal to Intermountain Power Agency and to Bear Coal Company, Inc. as described in their respective agreements entered into with those parties and presented to the Court is approved in all respects; and

IT IS FURTHER ORDERED that the proper officers of Kaiser Coal are authorized to take any and all actions required or contemplated by the agreements, including, without limitation, execution and delivery of the transfer documents referred to in the agreements, as well as any and all other documents that shall be necessary or advisable to perform their respective obligations under the agreements and to consummate said sales; and

IT IS FURTHER ORDERED that upon execution and delivery of the transfer documents and other documents as herein approved by the Court and the receipt by Kaiser Coal of the consideration recited in the respective agreements, IPA and Bear shall have the right to immediate possession of and shall have good title to and quiet enjoyment of the assets, undisturbed and free and clear of any and all claims, rights, encumbrances, and interests of any person against Kaiser Coal or any affiliate of Kaiser Coal, or against the estate, property, right, title and interest of each of Kaiser Coal and its affiliates in and to the assets so transferred; all such persons and claimants being hereby forever restrained and enjoined from interfering with or in any manner whatsoever disturbing such right of IPA and Bear to possession, title or quiet enjoyment of the property conveyed to them.