# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2801/10-2978

_____

| | | |
|---|---|---|
| National Labor Relations Board, | * | |
| | * | |
| Petitioner/Cross-Respondent, | * | |
| | * | On Petition for Review and Cross |
| v. | * | Application for Enforcement |
| | * | of an Order of the National |
| Leiferman Enterprises, LLC, doing | * | Labor Relations Board. |
| business as Harmon Auto Glass and | * | |
| its successor Auto Glass Repair and | * | |
| Windshield Replacement Service, Inc., | * | |
| | * | |
| Respondent/Cross-Petitioner. | * | |

_____

Submitted: March 15, 2011
Filed: August 12, 2011

_____

Before SMITH, ARNOLD, and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

Leiferman Enterprises, LLC ("Leiferman") unilaterally suspended negotiations with the International Union of Painters and Allied Trades District Council 82 (the "Union") regarding the renewal of the two parties' collective-bargaining agreement. The National Labor Relations Board (the "Board") eventually filed a complaint, but, during the litigation's pendency, a secured creditor forced Leiferman into receivership. During the receivership, the secured creditor sold Leiferman to Auto Glass Repair and Windshield Replacement Service (WRS), agreeing to indemnify WRS against any

potential Board liability. At length, the Board found Leiferman liable for certain unfair labor practices and imposed that liability on WRS, which it determined to be a liable successor-in-interest under *Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973). The Board now petitions this court to enforce its order, and Leiferman cross-petitions for review of that order. For the reasons that follow, we affirm and enforce the Board's order, and deny Leiferman's petition for review.

## I. *Background*

The now-defunct Leiferman sold and installed automotive glass at various facilities in the Minneapolis area. At all relevant times, the Union represented 15 of Lieferman's employees pursuant to a collective-bargaining agreement that was effective July 1, 2003, through June 30, 2006.

Leiferman financed the purchase of its business through a series of secured-lending agreements with Harmon Auto Glass Intellectual Property (HAIP). In September 2005, Leiferman consummated the most recent of these agreements but, shortly thereafter, defaulted on the loan. On April 30, 2006, Leiferman and HAIP entered into a "Forbearance Agreement," under which Leiferman agreed to (1) make periodic payments to HAIP and (2) complete the sale of Leiferman to a third party before September 15, 2006. HAIP perfected its valid security interests in Leiferman's assets under Minnesota law. Subsequently, Leiferman defaulted on the Forbearance Agreement's payment provisions, prompting HAIP to demand possession of and access to its collateral. Leiferman refused to do so, and, in response, HAIP filed a complaint in Minnesota state court for the appointment of a receiver, citing Leiferman's multiple defaults as well as its "erratic economic behavior in the operation of its business."

Contemporaneously, Leiferman and the Union conducted ongoing negotiations aimed at ironing out the terms of a new collective-bargaining agreement to replace the then-current agreement set to expire June 30, 2006. On August 13, 2006, after roughly

two months of negotiations, Leiferman implemented its final offer, apparently by fiat, and unilaterally altered its employees' terms and conditions of employment. From August through October 2006, the Union filed unfair labor practice charges with the Board, claiming that Leiferman's conduct violated §§ 8(a)(5) and (1) of the National Labor Relations Act (NLRA).

Meanwhile, on September 20, 2006, the Minnesota court administering Leiferman's receivership appointed Lighthouse Management Group ("the Receiver") as Leiferman's receiver and authorized the Receiver to operate Leiferman until the Receiver found a suitable buyer to purchase Leiferman's assets. Post-receivership, HAIP had to invest over $300,000 to continue Leiferman's day-to-day operations and thus protect its collateral.

Beginning in October 2006, the Receiver transmitted bid solicitations to nine potential buyers of Leiferman's assets. Those solicitations included due-diligence data apprising potential buyers of the liability risk stemming from Leiferman's ongoing labor disputes before the Board. On November 1, 2006, while these bid solicitations were outstanding, the Board issued a complaint and notice of hearing alleging that Leiferman had violated the NLRA by (1) unlawfully declaring an "impasse" in collective-bargaining negotiations and (2) unilaterally implementing changes without having reached a bona fide impasse.

On January 31, 2007, during this complaint's pendency, the Minnesota court administering Leiferman's receivership approved the sale of Leiferman to WRS. WRS knew of Leiferman's labor dispute from the bid solicitations and, in fact, required as a condition of its purchase of Leiferman that HAIP agree to indemnify WRS from any pending claims in the litigation before the Board. Notably, the Minnesota court's order approving the sale found that the "manner and terms of the proposed sale . . . are fair and commercially reasonable" and further provided that WRS's purchase of Leiferman was "free and clear of any liens and encumbrances." Subsequently, on August 20,

2007, a judgment was entered in HAIP's favor and against Leiferman and its former proprietor, Scott Leiferman, in the amount of $3,626,095, plus attorneys' fees and costs in the amount of $97,000.50, totaling $3,723,085.50. Following a sale of Leiferman's eligible assets, a deficiency of over $3,000,000 remains unpaid.

There was substantial continuity between pre-receivership Leiferman and the post-receivership, WRS-acquired Leiferman. After purchasing Leiferman, WRS continued Leiferman's business of automotive-glass sales and installation without interruption. All of the retail outlets that WRS added to its chain were Leiferman leaseholds that it assumed. Of the seven glass installers that WRS hired to staff these locations, five were selected from among Leiferman's 15 glass installers, and only two were hired from outside Leiferman. WRS also hired Leiferman's nine store managers—each of whom had installed glass at Leiferman before being promoted to store manager—and had them install glass at the locations as well. WRS took on four of Leiferman's five customer service representatives and Leiferman's lone salesperson. Finally, WRS also licensed the same trade name that Leiferman had licensed.

Still, WRS's acquisition of Leiferman did not produce a clone. WRS operated with a different corporate management and headquarters. WRS paid glass installers who previously worked for Leiferman different benefits and offered them different terms and conditions of employment, increased their job responsibilities, and required that they use different equipment and methods to install glass.

On February 21, 2008, the Board's administrative law judge (ALJ) issued her decision and order. The order directed Leiferman (and its successors and assigns) to reimburse its employees for any losses suffered as a result of Leiferman's unfair labor practices. Those practices included Leiferman's unilateral alteration of employment terms and conditions and its implementation of these changes absent a good-faith impasse during its bargaining with the Union. Furthermore, the ALJ found WRS liable as Leiferman's successor pursuant to the Supreme Court's decision in *Golden State*

*Bottling Co. v. NLRB*, 414 U.S. 168 (1973), and consequently assessed the monetary penalties to WRS. WRS agrees that, if found liable, the total amount that it owes is $54,518.25.

WRS appealed this ruling to the Board on the primary grounds that it was immune from *Golden State* successorship liability because (1) the Minnesota court's order approving its purchase of Leiferman explicitly stipulated that the purchase was "free and clear of any liens and encumbrances" and (2) HAIP will ultimately pay the penalty by virtue of its promise to indemnify, resulting in an inequitable outcome of a grossly underpaid secured lender having to pay unsecured claims stemming from labor abuses in which it had no hand. The Board rejected both of WRS's arguments and concluded that WRS is a *Golden State* successor that must pay for its predecessor's unfair labor practices. Specifically, the Board found that WRS satisfied all of the requirements for *Golden State*-successor liability, including the key requirement that there be substantial continuity between the business operations of the predecessor and that of the successor.

The Board petitions this court for enforcement of its order, and WRS cross-petitions this court for review of that order.

## II. *Discussion*

On petition for review, WRS maintains that the Board erred in imposing *Golden State*-successor liability on WRS for Leiferman's past unfair labor practices. WRS advances several theories why *Golden State* successorship is inapplicable, but these may be distilled to three primary arguments: (1) it would be inequitable for a secured creditor like HAIP, that did not receive full recovery on its secured claims, to pay the claims of unsecured creditors who ordinarily would be lower in payment priority under traditional debtor/creditor law; (2) WRS, in any case, is not Leiferman's *Golden State* successor because (a) substantial continuity does not exist, and (b) even if it did, Leiferman was in receivership and thus financially unable to pay the claims itself; and

(3) the Minnesota court's order approving WRS's purchase of Leiferman expressly provided that the sale was "free and clear" of any and all liens and encumbrances. WRS's arguments are unpersuasive, and we therefore affirm and enforce the Board's order and deny WRS's petition for review.

### A. *Overview of* Golden State *Successorship*

As WRS concedes, "[the Board's] decisions are given deference." Congress has significantly limited the scope of this court's review over Board decisions. Specifically, the same standard of review applies to both WRS's petition for review and the Board's petition for enforcement, and that standard mandates that "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e) (applying to Board petitions for enforcement); *accord id.* § 160(f) (applying to employer petitions for review). As we have reinforced,

> [o]ur standard of review affords great deference to the Board's affirmation of the ALJ's findings. We will enforce the Board's order if the Board has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole. Substantial evidence exists when a reasonable mind might accept a particular evidentiary record as adequate to support a conclusion.

*Wal-Mart Stores, Inc. v. NLRB*, 400 F.3d 1093, 1097 (8th Cir. 2005) (internal quotations and citations omitted).

In the instant case, the record as a whole contains substantial evidence to support the Board's imposition of *Golden State*-successor liability on WRS. In *Golden State*, the Supreme Court affirmed the Board's authority under the NLRA to hold a bona fide purchaser of a company liable for the company's pre-purchase, unfair labor practices. 414 U.S. at 176. Specifically, the Court premised this conclusion on its

reading of § 10(c) of the NLRA. *Id.* Section 10(c) of the NLRA provides, in pertinent part, that

> [i]f upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, *as will effectuate the policies of this subchapter . . . .*

29 U.S.C. § 160(c) (emphasis added).

Relying on § 10(c)'s broad directive to the Board to issue orders "as will effectuate the policies of this subchapter," the Court read § 10(c) to confer "remedial powers . . . [which] include broad discretion to fashion and issue [an] order" imposing liability for a company's past unfair labor practices on a bona fide purchaser of that company, even if that bona fide purchaser had no hand in the company's pre-purchase practices. *Golden State*, 414 U.S. at 176. A unanimous court declared that "§ 10(c) does not limit the Board's remedial powers to the actual perpetrator of an unfair labor practice and thereby prevent the Board from issuing orders binding a successor who did not himself commit the unlawful act." *Id.* Rather, "[t]he Board's orders run to the evader and the bona fide purchaser, not because the act of evasion or the bona fide purchase is an unfair labor practice, but because the Board is obligated to effectuate the policies of the [NLRA]." *Id.* at 177. Accordingly, the Supreme Court in *Golden State* announced the following rule for determining when a bona fide purchaser may be deemed a "successor in interest," and thus be held liable for the past unfair labor practices of the company it acquired: "[w]hen a new employer . . . has acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations, those employees who have been

retained will understandably view their job situations as essentially unaltered." *Id.* at 184. Finally, the Court added that, in order to prevent judicial enforcement of such Board orders from running afoul of Federal Rule of Civil Procedure 65(d)—which permits injunctions to be binding only on parties to an action, or those in privity with a party—the bona fide purchaser must acquire the malfeasant company "with knowledge that the wrong remains unremedied" so that the purchaser "may be considered in privity with its predecessor for purposes of Rule 65(d)." *Id.* at 180.

### B. *Application of* Golden State-*successorship to WRS*

The *Golden State* successor-liability test confirms that the Board properly found WRS liable as a successor-in-interest to Leiferman for Leiferman's unfair labor practices. This circuit has addressed *Golden State* successorship in *NLRB v. Winco Petroleum Co.* There, we concluded that "[s]uccessorship cases are fact-intensive." 668 F.2d 973, 975 (8th Cir. 1982). "'[P]articularly in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate.'" *Id.* (quoting *Howard Johnson, Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 254 (1974)). In *Winco Petroleum*, we affirmed the Board's imposition of *Golden State* successorship based on the following four factual findings: (1) the bona fide purchaser acquired the company "with actual knowledge of [the company's] pending unfair labor practice charges"; (2) "there was little or no interruption in business operations at the [acquired company's] stations as a result of the acquisition"; (3) the bona fide purchaser "continued to operate the enterprise without substantial change"; and (4) a majority of the bona fide purchaser's employees at the acquired company's stations were former employees of the acquired company. *Id.* at 978.

A review of the whole record, as presented to the Board, reveals that substantial evidence of each of these factors existed. Notably, WRS filed a "Stipulation of Fact" in advance of its Board proceedings, and the Board essentially recited this stipulation

in its order. First, WRS concedes that it knew of Leiferman's ongoing case before the Board because it was among the nine potential investors to whom the Receiver presented due-diligence data warning of the pending suit and its attendant liability risks. Moreover, WRS purchased Leiferman *on the condition* that HAIP indemnify it against any liabilities arising out of the existing Board suit. Second, the Board found, and WRS does not dispute, that, after purchasing Leiferman, WRS continued Leiferman's business of automotive-glass sales and installation without interruption. Third, substantial evidence supports the Board's finding that WRS continued to operate Leiferman without substantial change. All of the retail outlets that WRS added to its chain were Leiferman leases that it assumed, and WRS even licensed the same trade name that Leiferman had licensed.

In its favor, WRS observes with respect to this third factor that it operated Leiferman with a different corporate management and headquarters, paid glass installers who previously worked for Leiferman different benefits and offered them different terms and conditions of employment, increased those employees' job responsibilities, and required that they use different equipment and methods to install glass. However, we find these alterations to Leiferman's business model to be relatively minor and do not represent the kind of material change that would make successor liability inapplicable.

Fourth, and finally, a majority of the employees constituting the reorganized Leiferman were holdovers from the old Leiferman entity. Of the seven glass installers that WRS hired to staff the Leiferman locations that it assumed, five were selected from among Leiferman's 15 glass installers, and only two were hired from outside Leiferman. WRS also hired Lieferman's nine store managers, each of whom had installed glass at Leiferman before being promoted to store manager, and had them install glass at Leiferman's old locations as well. WRS took on four of Leiferman's five customer service representatives and Leiferman's lone salesperson.

For its part, WRS argues that its retention of only five of Lieferman's 15 glass installers militates against a finding of substantial continuity. However, the overwhelming majority of Lieferman's labor force post-receivership at the old Lieferman locations are former, pre-receivership Lieferman employees. We have stated that, as one of the prerequisites for concluding that a successor owes a duty to collectively bargain pursuant to its predecessor's collective-bargaining agreement, a "a majority of the successor's employees must have been employed by the preceding employer," *Smegal v. Gateway Foods of Minneapolis, Inc.*, 819 F.2d 191, 194 (8th Cir. 1987). But the Supreme Court as well as our circuit have stressed that "'[t]here is, and can be, no single definition of 'successor' which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others.'" *Winco Petroleum Co.*, 668 F.2d at 977 n.1 (quoting *Howard Johnson Co.*, 417 U.S. at 263 n.9). Indeed, in assessing the continuity between a predecessor and successor for purposes of *Golden State* liability in *Winco*, we focused *not* on the percentage of former employees retained, but instead on what percentage of the successor's labor force at its predecessor's old locations is comprised of the predecessor's former employees. *Id.* at 978.[1] Thus, because "a majority of [WRS's] employees at the former [Lieferman] stations were former [Lieferman] employees," sufficient labor force continuity exists between Lieferman and WRS for *Golden State*-successorship purposes.

---

[1]This court, in *dictum*, cited *Winco* for the proposition that "[i]n one case the circuit did determine that an employer was a successor when a majority of the predecessor's employees had been hired." *Smegal*, 819 F.2d at 194. This reading of *Winco* is squarely at odds with what that case actually held and thus represents a misreading of the case. Therefore, we disregard this language in *Smegal* because it is dictum and, insofar as it contradicts *Winco*, has no precedential value because a subsequent panel of this court cannot overrule a prior panel's decision. *See United States v. Gaines*, 639 F.3d 423, 428 n.4 (8th Cir. 2011) ("We therefore apply the more accurate prior panel statement of the law under the rule that precludes one panel of this court from overruling a prior panel's decision").

Similarly, on the entire record as a whole, substantial evidence exists such that "a reasonable mind might accept [this] particular evidentiary record as adequate to support [the] conclusion" that WRS is Leiferman's *Golden State* successor. *See Wal-Mart Stores, Inc.*, 400 F.3d at 1097 (quotations and citations omitted). Moreover, none of WRS's novel legal arguments against the imposition of *Golden State* successorship are availing. For instance, that HAIP, an unsecured creditor, will ultimately pay approximately $55,000 to compensate unsecured labor claimants is a direct product of HAIP's own free bargaining. HAIP wanted to recover some value from its collateral in Leiferman's assets, and, to accomplish this, it voluntarily agreed to indemnify the purchaser. Indeed, this type of transaction is precisely what the Supreme Court envisioned as one of the benefits that *Golden State* successorship conferred:

> Since the successor must have notice before liability can be imposed, his potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sales contract which will indemnify him for liability arising from the seller's unfair labor practices.

*Golden State*, 414 U.S. at 185 (internal quotations and citations omitted). WRS's appeal to equity on a third party's behalf when that third party freely contracted for the purportedly inequitable treatment is meritless. WRS's argument that the Minnesota court order's "free and clear" language somehow preclude's *Golden State* successorship is likewise meritless. The Minnesota court order approved the sale based in part on its finding that the "manner and terms of the proposed sale . . . are fair and commercially reasonable." One of the sale's terms *was* the indemnification clause compelling HAIP to indemnify WRS against any resulting NLRA liability.

In sum, the record, reviewed as a whole, contains substantial evidence to support the Board's conclusion that WRS is Leiferman's *Golden State* successor-in-interest.

-11-

### III. *Conclusion*

Based on the foregoing, we hereby enforce the Board's order and deny WRS's petition for review.

_____